**Mary Y. LIU, Plaintiff,**

v.

**Giacomo STRIULI and Providence College, Defendants.**

**C.A. No. 96–0137L.**

United States District Court,
D. Rhode Island.

Jan. 19, 1999.

---

Gerald C. DeMaria, John F. Kelleher, James A. Ruggieri, Higgins, Cavanagh & Cooney, Providence, RI, Patricia E. Andrews, Providence, RI, for plaintiffs.

Lynette Labinger, Roney & Labinger, Providence, RI, for defendant Striuli.

Marifrances K. McGinn, Richard P. McMahon, McMahon & McMahon, Providence, RI, for all other defendants.

## OPINION AND ORDER

LAGUEUX, Chief Judge.

Plaintiff Mary Liu ("Liu") was a graduate student at defendant Providence College (the "College") when, she alleges, she was sexually harassed over the course of one year by defendant Giacomo Striuli ("Striuli"), who at the time was a professor at the College. In her Amended Complaint alleging federal and state causes of action against both Striuli and the College, Liu seeks a monetary award and equitable relief. Striuli's Motion for Summary Judgment on all of plaintiff's claims, or, alternatively, Partial Summary Judgment on some of the claims is now before this Court for consideration. Also before the Court is the College's Motion for Summary Judgment as to all counts asserted against it. For the reasons set forth below, Striuli's motion is granted in part and denied in part. The College's motion is granted in its entirety.

## BACKGROUND

The complex nature of the causes of action asserted by Liu necessitates a careful review of the facts of the tangled associations between these parties. Many facts are in dispute regarding the nature of the relationship between Liu and Striuli and the actions of relevant characters in this controversy. Because the task before this Court is to determine whether summary judgment is appropriate, the Court must view the facts on the record and all reasonable inferences therefrom in the light most favorable to the non-moving party. *See Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). Liu is entitled to the benefit of this rule at this stage of the proceeding and the following recitation of facts has been constructed with those ground rules in mind.

Liu, a native of Taiwan, entered the graduate program in history at Providence College in the fall of 1992. She had been a student in the M.B.A. program at Johnson & Wales University in Providence, Rhode Island since 1990 when she first came to the United States. Liu was able to study in the United States because she had applied for and received an F-1 student visa from the federal government that allowed her to reside in this country while pursuing her education. Liu began working on her Ph.D. in history in the fall of 1993 and was formally accepted into the Ph.D. program by the College in the fall of 1994. While at the College, Liu worked as a graduate assistant in the College's Dominican Archives from September 1992 until May 1996.

The series of events which resulted in her first encounter with Striuli was precipitated by a trip she took in December 1993 with her brother, who was also studying in this country, to Austria where her mother resided. Before leaving, Liu asked Fr. Thomas McGonigle ("Fr.McGonigle"), the Vice President for Academic Affairs at the College, whether her immigration documents were in order for her trip abroad. After signing Liu's Form I-20,[1] Fr. McGonigle told Liu that she could now leave the country.

Liu discovered, however, that there were problems with her visa status when she attempted to return to the United States in early January 1994. In Vienna, United States immigration officials informed her that her F-1 visa had expired. After several days in Austria, the American Embassy issued her a B-2 tourist visa that allowed her to return to the United States. Liu was

---

1. The Form I-20, officially known as the "Certificate of Eligibility for Nonimmigrant (F-1) Student Status—For Academic and Language Students", is an essential element of the application for admission to the United States of aliens seeking student visa status. *See* 8 C.F.R. § 214.2(f). The student must present this document to the proper immigration officials before a student (F-1) visa will be issued. *See id.* The Form I-20 must be certified by an official of the college or university that the student will be attending in the United States. *See id.* In that document, the school official verifies that the applicant has been

accepted to the school, that the student will pursue a full-time academic course, that the student has the financial resources to complete the course of study chosen, and that the student is expected to complete the course of study by a specified date. *See id.* A student who has been admitted to the United States under an F-1 visa may leave the country temporarily and later return if the Form I-20 has been properly executed by the appropriate school official. *See id.* The student may need a new Form I-20 if there is a material change in her course of study or if her visa status changes. *See id.*

unaware at the time that the visa she had been granted was different from the F–1 visa that she had previously held.

In September of 1994, Dr. Donna McCaffrey ("Dr.McCaffrey") of the History Department learned that there was a problem with Liu's visa. The B–2 tourist visa issued by the American Embassy in January was valid for only six months and had expired that summer. Dr. McCaffrey referred Liu to Assistant Registrar Ann Loomis ("Loomis") because Loomis was a "Designated School Official"[2] ("DSO") for the Immigration and Naturalization Service ("INS") at the College. At a meeting on September 30, 1994, Loomis explained to Liu that she would need to submit a new Form I–20 to the INS to resolve the problem with her immigration status. Loomis also told Liu that as a graduate student, she would have to speak with Striuli, who was the DSO who handled the immigration affairs of graduate students. Striuli, a tenured professor in the Department of Modern Languages who was hired by the College nine years earlier, was also the College's International Student Advisor ("ISA") at that time, a post which required him to act as a liaison between foreign students and the College community. Liu, however, had never met Striuli prior to October 3, 1994.

At that meeting with Liu, Loomis telephoned Striuli and informed him that she would be referring a graduate student with a visa problem to him. On October 3, 1994, Liu met Striuli for the first time. They met for several hours in Striuli's office on campus to discuss Liu's immigration status. The facts of the relationship, beginning with the events of the initial meeting between Striuli and Liu on October 3, are sharply disputed. For the purposes of this motion, however, the Court will relate the remainder of the facts as they have been alleged by Liu in her deposition evidence, mindful that Striuli objects to the accuracy of most of what Liu poses as fact.

At this October 3 meeting, Striuli prepared, signed, and handed over to Liu a Form I–20. Liu also signed the form at the meeting. According to Liu, Striuli informed her that her immigration problems made her "technically illegal," that she could be deported, and that he was the only official at the College who could help her maneuver through the "tricky" procedures of the INS. When Liu began to cry, Striuli sat next to her and stroked her thigh. Later in the meeting, Striuli told her that he would have to write a "moral character letter" on her behalf to the INS. In order to do so, Striuli said, he would have to get to know her better. Striuli then asked Liu several times if she would go out with him. Liu declined each request.

In the days following that first meeting, Striuli repeatedly asked Liu to go out with him. He had obtained her class and work schedules and contacted her at home and at work. Striuli explained to her that in order to write the moral character letter necessary for the visa application, they needed to spend time together. Liu finally relented and the two met at a bar sometime between October 3 and October 13. At the bar, Striuli kissed Liu and stroked her thigh. Liu does not allege that she specifically objected in any way to these actions.

Sometime prior to October 13, 1994, Liu met with Professor Richard Deasey ("Deasey"), a member of the faculty in the History Department, and Striuli regarding the delay in her visa application. Deasey testified at his deposition that Liu was tense at the meeting and felt great anxiety about her immigration dilemma. Liu claims that throughout early October, Striuli repeatedly told her that she could be deported because of her illegal status. Dr. McCaffrey recalls Liu telling her during this time period that she was sure that she would be deported. At the meeting, Deasey asked Striuli why Liu had not yet received a new visa. Striuli laid

---

**2.** Each educational institution that has been approved by the federal government to receive foreign students must appoint members of the school's administration to serve as "DSO"s. *See* 8 C.F.R. § 214.3(1). INS regulations assign a variety of tasks to DSOs, including the execution of the Form I–20 for each foreign student and the recommendation of students for employment off-campus. *See id.* § 214.2(f). There were five DSO's at the College. Striuli and Loomis were two of them.

the blame on the failure of the INS to provide him with the proper forms for the application process. Deasey later explained that he found Striuli's answers evasive and that he had the impression that Striuli was not fulfilling his duties as DSO adequately.

On October 13, 1994, Liu alleges that Striuli raped her for the first time. That evening, Striuli telephoned Liu at home and informed her that he would visit her after his class. After Liu told him that she would be busy that evening, Striuli insisted that he see her that evening. Striuli arrived at Liu's apartment later that night. Liu had turned off the lights in her apartment in an attempt to trick Striuli into believing that she was not at home. Undeterred, Striuli rapped on her door and demanded entrance. When Liu opened the door, Striuli shoved her to the floor, tore off her outer and under garments and raped Liu, all the while repeating: "you want this." After the rape, Liu discovered that she had vaginal bleeding. Striuli, mentioning his friendship with Fr. McGonigle, Vice President of Academic Affairs, threatened to have her expelled from the College if she reported the rape. Striuli also claimed to have the power as ISA to deport her. Liu reports that soon thereafter she "blacked out."

Liu alleges that she was raped by Striuli again sometime between October 13 and October 20, 1994 and yet a third time on October 20, the day she went to a gynecologist and began to use birth control pills. Liu contends that she never willingly engaged in any intimate acts with Striuli over the course of their relationship.

In November 1994, Liu's immigration problem was resolved. Deasey received a form from his son, an INS official, in early November which he believed was the proper application form for Liu's new visa. Some time prior to November 14, Liu met with Striuli and signed a letter to the INS drafted by him. Liu met with an INS official on November 14 and was told then that her visa had been reinstated.

Liu alleges that Striuli's abuse continued even after her immigration problem was settled. Between November 14, 1994 and July 4, 1995, Liu alleges that Striuli forced her to have sex with him "at least one hundred times." She alleges that Striuli abused her verbally, by implying that he could kill her, and physically, by pulling her hair, twisting her arms, and kicking her legs open in order to have sex. Liu continued to attend classes and to report to work in the Archives during this period, but she maintains that her academic work and grades suffered as a result of Striuli's harassment.

Liu maintains that at least two College officials were aware that she was engaged in some type of intimate relationship with Striuli between October 1994 and August 1995. In the fall of 1994, Herbert D'Arcy ("D'Arcy"), the College's Director of Financial Aid, learned that Liu and Striuli were regularly seeing each other socially. D'Arcy was Striuli's friend and even allowed Striuli to live with him for several months in the fall of 1994. Exactly what D'Arcy knew about the relationship between Liu and Striuli is unclear from the record. D'Arcy knew that Liu was a student at the College. But Liu maintains that D'Arcy was a participant in Striuli's harassment of her. She contends that Striuli and D'Arcy often in her presence engaged in lewd banter regarding female students and Striuli's sexual exploits, knowing that the comments were offensive to her. According to Liu, D'Arcy told Striuli, also in Liu's presence, that Striuli had no reason to fear that College officials would look askance at his relationship with Liu because Striuli was tenured.

In stark contrast to Liu's version of events, D'Arcy testified at his deposition that he observed Liu and Striuli on several occasions playing the part of an affectionate couple. He described a tennis outing in November 1994 that he, Liu, and Striuli attended. D'Arcy testified that the couple held hands, kissed, and seemed to have affection for one another. D'Arcy testified at his deposition that this type of conduct was typical for the couple based on his observations of them in social settings.

There is also some evidence that Professor Paul O'Malley ("O'Malley"), Director of the Graduate History Program, knew of the relationship. It is unclear from the evidence

before the Court on this motion exactly what O'Malley knew and when he discovered it. The evidence does, however, support a finding that O'Malley told a College sexual harassment officer who investigated Liu's claims in September 1995 that he thought the relationship was "turbulent."

Shortly before Striuli left Rhode Island on a trip to Italy in early July 1995, Liu made plans to move into a new apartment with a roommate. Although she received the keys to this new apartment in early July, she had not yet completely moved when Striuli returned on August 13. When Liu told Striuli that she planned to move and wanted to stop seeing him, Striuli threatened to have her deported or expelled from the College. Striuli continued to call Liu until she agreed to meet him once more on August 20, 1995.

The two arranged to meet at a bookstore in Providence. Liu arrived first and when Striuli appeared, he immediately rushed her away from the store. Liu alleges that he forced her to drive back to her apartment. When they arrived at Liu's apartment, Striuli shoved her inside, forced her to the floor, and climbed on top of her. But then the telephone rang and Liu rose to answer it. When Liu refused to tell Striuli who was calling, he threw a glass at her, which shattered at her feet. Liu testified that she feared that Striuli might cut her with the broken glass. After Liu hung up the phone, Striuli insisted that they go to his apartment. At Striuli's apartment, Liu alleges that he raped her again.

Liu maintains that she continued to insist that their relationship end. Striuli, however, continued to confront her over the telephone and at her workplace, always insisting that she had no choice in the matter. One of those confrontations occurred on August 30, 1995 when at about midnight Striuli came to Liu's apartment and, banging and kicking against her door, demanded that she let him in. Liu told him to leave and threatened to call the police, but Striuli was undeterred until the police arrived. The police suggested to Liu that she obtain a restraining order against Striuli from the Rhode Island District Court.

The next day, Liu filed for a temporary restraining order against Striuli. In her Complaint for Protection from Abuse filed on August 31, 1995 in the Sixth Division of the District Court of the State of Rhode Island, Liu alleged that Striuli coerced her into a relationship by using his status as a College official and by threatening to sabotage her immigration dealings with the INS. She explained that Striuli physically hurt her by twisting her arms and pinning them down against her chest. In the Complaint Liu alleged that Striuli physically hurt her and coerced her into having an "intimate sexual relationship."

A Temporary Order for Protection from Abuse was granted by the District Court on August 31, 1995 enjoining Striuli from "assaulting, molesting, or otherwise interfering" with Liu. Before the court could hold an adversary hearing on the merits of issuing a permanent order, the parties agreed to a consent order. The order was entered by the District Court on October 16, 1995 and essentially extended the terms of the temporary order for the duration of Liu's studies at the College.

On September 1, a Friday, Liu informed her work supervisor, Fr. Ingham, that she had a restraining order against Striuli. Fr. Ingham immediately referred her to Fr. McGonigle. Fr. McGonigle's assistant, Rose Pagano ("Pagano"), scheduled Liu to meet with Fr. McGonigle on the next business day, September 5. Liu related to Pagano the substance of her allegations against Striuli and Pagano made a copy of the Temporary Restraining Order.

On September 5, Liu, accompanied by Deasey, met with Fr. McGonigle and Gail Dyer ("Dyer"), the College's Sexual Harassment Officer. Liu recounted her version of the facts regarding her relationship with Striuli. Dyer informed Liu that she had already launched an investigation into Liu's claims. Striuli resigned as ISA on September 4, 1995, citing increased professional demands.

During the period of the harassment, the College had in place a Sexual Harassment Policy that had been adopted on March 17, 1993. The topic of amorous relationships between faculty and students was addressed

by the Policy. It advised against such relationships even though they may appear to be wholly consensual: "[R]omantic liaisons should be avoided and the College will provide no legal defense for any employee or faculty member charged with sexual harassment in instances where a romantic liaison exists and the power relationship is clearly unequal."

It is unclear from the record how widely distributed the actual text of this Policy was on campus. A summary of the College's 1993 Policy was included in the Student Handbook for the years relevant to this lawsuit. The short summary merely recites a generic definition of sexual harassment and provides a list of names of College officers to whom a student might bring a sexual harassment issue.

The College adopted a new Sexual Harassment Policy on September 11, 1995, several days after Liu met with Fr. McGonigle and Dyer. The new Policy, while discouraging romantic relationships between students and faculty, does not warn, as did the 1993 Policy, that the College will refuse to defend a faculty member who is charged by a student with sexual harassment following an amorous relationship between the two. In her investigation of Liu's harassment complaint, Dyer .turned to the provisions of this new Policy for guidance on the applicable standards. The Policy was also the basis for Fr. McGonigle's final determination of Liu's complaint.

After· concluding her investigation, which included interviews of Liu, Striuli, and five other witnesses, Dyer issued a report to Fr. McGonigle on October 6, 1995. Dyer concluded that "[e]ven assuming that Ms. Liu entered into the relationship reluctantly, the evidence shows that at some point soon after it began, she returned Dr. Striuli's affections." But even a consensual relationship between Liu and Striuli troubled Dyer. She explained that "[t]he sexual harassment policy is clear on this matter. Faculty members should not become involved in romantic relationships with students, especially those over whom they have supervision." Based on her belief in the inherent inappropriateness of a student-faculty relationship, Dyer concluded that "there is a reasonable basis to believe that [Liu's] claim has some merit." No specific sanction was recommended by Dyer in her report.

On October 11, 1995, Fr. McGonigle rendered his decision on Liu's sexual harassment complaint. He concluded that Striuli's actions were "at variance" with the portion of the 1995 Sexual Harassment Policy discouraging amorous relationships between faculty and students. He also concluded that the relationship had been mutually consensual. Fr. McGonigle decided that a letter of reprimand for failing "to exercise appropriate professional judgment by entering into a romantic relationship with a student" was a fitting sanction for Striuli.

Liu responded to this alleged pattern of harassment by filing the instant lawsuit against both Striuli and the College.[3] The Amended Complaint contains eight counts. Count I alleges a cause of action against both Striuli and the College for violation of Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U.S.C. §§ 1681–1688. Count II alleges a cause of action against Striuli under the civil remedy provisions of the federal Violence Against Women Act, 42 U.S.C. § 13981. Count III alleges a cause of action against both Striuli and the College under the Rhode Island Civil Rights Act, R.I.Gen.Laws §§ 42–112–1 to –2. Count IV alleges a cause of action against Striuli under the Rhode Island Privacy Act, R.I.Gen.Laws § 9–1–28.1. Count V alleges a cause of action against Striuli for assault and battery under state common law. Count VI alleges a cause of action against Striuli for

---

**3.** This Court has subject matter jurisdiction over this lawsuit based on diversity of citizenship of the parties. *See* 28 U.S.C. § 1332(a)(1). At the time of the filing of the lawsuit, both defendants were citizens of Rhode Island and the plaintiff was a legal resident alien domiciled in Massachusetts. The plaintiff also alleged an adequate amount in controversy. This Court would also be justified in exercising jurisdiction over this case based on federal question jurisdiction because Liu has alleged federal statutory rights of action against both defendants. *See id.* § 1331 (granting district courts federal question jurisdiction); § 1367(a) (granting district courts supplemental jurisdiction over certain state law claims that are "part of the same case or controversy" as a claim for which the district court has original jurisdiction).

intentional infliction of emotional distress under state common law. Count VII alleges a cause of action against both Striuli and the College for negligent infliction of emotional distress under state common law. Finally, Count VIII alleges a cause of action against the College for negligent hiring and supervision under state common law. Before the Court now is the College's Motion for Summary Judgment as to Counts I, III, VII, and VIII and Striuli's Motion for Summary Judgment as to all Counts or, in the alternative, Partial Summary Judgment as to Counts I, II, III, IV, and VII.

## DISCUSSION

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In determining whether summary judgment is appropriate, the Court must view the facts on the record and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). However, a grant of summary judgment "is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.*, 777 F.Supp. 167, 169 (D.R.I.1991). Summary judgment is only available when there is no dispute as to any material fact and only questions of law remain. *See Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996). Additionally, the moving party bears the burden of showing that no evidence supports the nonmoving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II. Analysis

### A. MOTION FOR SUMMARY JUDGMENT BY THE COLLEGE

#### 1. COUNT I: TITLE IX

##### a. The standard for institutional liability under Title IX for the conduct of employees

■ Liu argues that she may recover damages from the College for Striuli's alleged sexual harassment through a right of action implied from Title IX of the Education Amendments of 1972, 86 Stat. 373, as amended, 20 U.S.C. §§ 1681–1688. ("Title IX"). The relevant text of Title IX provides that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statutory language itself does not provide a private right of action for victims of sex bias at educational institutions. Rather, the express statutory language contemplates administrative enforcement by empowering federal agencies to withhold federal appropriations from offending educational institutions. *See id.* § 1682 (authorizing federal agencies to terminate funding to offending institutions and to use "any ... means authorized by law" to enforce their non-discrimination regulations).

■ There is, however, recourse under Title IX for a private litigant. The United States Supreme Court has recognized an implied private right of action under the statute. *See Cannon v. University of Chicago*, 441 U.S. 677, 717, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). The Court further developed the contours of this right of action in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). In *Franklin*, the Court instructed that a school can be held liable for monetary damages for the sexual harassment of a student by a teacher. *See id.* at 73–76, 112 S.Ct. 1028. Specifically, the Court decided that a school district could be liable for monetary damages when intentional discrimination was proven and that a pattern of sexual harass-

ment by a teacher qualified under that standard. *See id.*

Left undefined by the Court until recently, however, were the exact legal standards for institutional liability under Title IX to be applied by the lower courts. Those standards were finally charted by the Court in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). That case is controlling here on the question of the College's liability under Title IX.

In *Gebser*, a high school student brought a sexual harassment lawsuit against her teacher and her school district, basing her claim against the school district in part on Title IX. *See id.* at 1993. The student had been involved in an intimate sexual relationship with the teacher during the school year. *See id.* The plaintiff adduced no evidence that officials of the school district were aware of this sexual relationship, although the principal of the plaintiff's school had received complaints from two parents concerning offensive remarks made by the teacher in his classroom. *See id.* The plaintiff argued that the school district should be held liable for the teacher's actions based on two theories.

First, the plaintiff argued that a school district is liable for damages under Title IX by application of the doctrine of respondeat superior. *See id.* at 1995. This theory, based on a policy announcement from the United States Department of Education, would hold school districts liable where the teacher is " 'aided in carrying out the sexual harassment of students by his or her position of authority with the institution.' " *Id.* (quoting Office of Civil Rights, Dep't of Educ., Sexual Harassment Policy Guidance, 62 Fed. Reg. 12034, 12039 (1997)); *see also Restatement (Second) of Agency* § 219(2) (1958) (discussing the "aided by agency" theory of respondeat superior liability). Second, the plaintiff argued for a constructive notice standard that would impose liability on a school district if officials "should have known" about the harassment. *See Gebser*, 118 S.Ct. at 1995. Both theories were rejected by the Court in favor of a standard that only recognizes a far more narrow range of institutional liability for an employee's actions.

The standard for institutional liability adopted by the *Gebser* Court is an exacting one which rejects entirely liability based on constructive notice or apparent authority principles. The *Gebser* holding is unambiguous:

> [I]n cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.
>
> We think, moreover, that the response must amount to deliberate indifference to discrimination.

*Id.* at 1999. The Court explained that it sought to avoid a rule that might result in holding educational institutions liable for the independent actions of their employees. *See id.*

Liu, unwilling to concede defeat on the Title IX claim against the College, advances two rejoinders in an attempt to salvage her cause of action. First, she argues that the Supreme Court intended the *Gebser* standard to apply only to claims of "hostile environment" sexual harassment and not to actions alleging the "quid pro quo" variety of harassment. Next, Liu argues that the facts of her case fit within the narrow confines of the *Gebser* standard. Neither contention can rescue her Title IX claim against the College.

■ The Supreme Court has downplayed the value of the sexual harassment labels "hostile environment" and "quid pro quo." *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998) (explaining that the terms are not controlling on the vicarious liability issue). Nevertheless, the Court has acknowledged that the terms are helpful in categorizing two broad categories of sexual harassment. *See id.* (explaining that the terms are not irrelevant "when there is a threshold question whether a plaintiff can prove discrimination

in violation of Title VII"). Generally, a plaintiff alleges quid pro quo harassment when the plaintiff claims that "a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." *Id.* A hostile environment sexual harassment case is one in which the supervisor's threats or offensive conduct are severe or pervasive, but the threats are unfulfilled. *See id.* Liu, without success, attempts to resuscitate her action with a theory commonly asserted by sexual harassment plaintiffs relying on Title VII, but recently rejected by the Supreme Court in the context of Title IX institutional liability. She posits that vicarious liability should be imposed on an employer automatically if the plaintiff can prove a case of quid pro quo harassment. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998) (holding that an employer has no affirmative defense to vicarious liability in a Title VII suit "when the supervisor's harassment culminates in a tangible employment action"). Liu maintains that *Gebser* did not affect this rule because in that case the Court addressed only hostile environment claims, while her allegation is based on quid pro quo harassment. Therefore, she argues, a holding of vicarious liability against the College is compelled by resort to the rules commonly applied to quid pro quo harassment cases.

■ The gaping hole in plaintiff's argument, however, is that the *Gebser* opinion makes no distinction between the two types of sexual harassment claims in the Title IX context. In fact, neither term is mentioned in the opinion. The Court's broad language, quoted above, applies to both types of harassment in Title IX cases. *See Gebser,* 118 S.Ct. at 1999. This conclusion has been reached by several federal courts that have ruled on Title IX sexual harassment claims since the Court issued the *Gebser* decision. *See Morse v. Regents of the Univ. of Colorado,* 154 F.3d 1124, 1127 (10th Cir.1998) (stating that the *Gebser* rule applies if plaintiffs "were subjected to quid pro quo sexual harassment or subjected to a sexually hostile environment"); *Klemencic v. Ohio State Univ.,* 10 F.Supp.2d 911, 918–21 (S.D.Ohio 1998) (applying the *Gebser* rule to a quid pro quo sexual harassment claim); *Burtner v.*

*Hiram College,* 9 F.Supp.2d 852, 856–57 (N.D.Ohio 1998) (applying the *Gebser* rule to a quid pro quo sexual harassment claim). Liu has failed to cite, and this Court has been unable to identify, any case holding to the contrary.

### b. Application of the *Gebser* rule to Liu's claim

■ In applying the *Gebser* rule to the facts of this case, it is clear that Liu has failed to satisfy the Supreme Court's test for imposition of vicarious liability on the College. Liu must first demonstrate that an official of the College who had "authority to take corrective action" had actual knowledge of the harassment by Striuli. *Gebser,* 118 S.Ct. at 1999. She has failed to do so. The best that Liu can do is to argue that both D'Arcy and O'Malley qualify as officials whose actual knowledge of the relationship between herself and Striuli must be imputed to the College. This reasoning fails on two counts.

First, Liu has not adduced sufficient evidence to demonstrate that either D'Arcy or O'Malley had actual knowledge of Striuli's alleged sexual harassment. Although there is evidence that D'Arcy knew of the sexual nature of the relationship between Liu and Striuli, there is no evidence that D'Arcy had actual knowledge that the relationship was anything but mutually consensual. Liu claims that D'Arcy was often in the company of Striuli and herself during the fall of 1994 and the spring of 1995, however, Liu does not allege that she ever attempted to tell D'Arcy that her relationship with Striuli was abusive or coerced. Liu alleges that Striuli made lewd comments regarding female students in her and D'Arcy's presence. She does not allege that she objected in any way to those comments. However, assuming that lewd comments were made, they alone would be a totally inadequate basis for finding that D'Arcy had actual knowledge of sexual harassment of Liu by Striuli. Finally, Liu argues that given the lewd comments by Striuli and the very fact that Liu was then a student, D'Arcy "should have known" that the relationship was abusive. This constructive notice argument is patently inadequate

under the *Gebser* standard which requires actual knowledge of the harassment.

Vicarious liability also cannot be foisted upon the College through D'Arcy's alleged inaction because he is not an official of the College "with authority to take corrective action to end the discrimination." *Gebser*, 118 S.Ct. at 1999. D'Arcy, as Director of Financial Aid, was not a supervisor of Striuli nor was he an official who had the authority to police relationships between faculty and doctoral students. D'Arcy had no power to discipline or even to question Striuli about the relationship. If, as Liu argues, D'Arcy had a duty under the College's sexual harassment policy to report to the appropriate authority his knowledge of Striuli's relationship with Liu because it may have violated the prohibition on amorous faculty-student liaisons, this duty was no more than that which every employee of the College had. Such a duty to report information to appropriate authorities is plainly not an "authority to take corrective action" because the report itself could not have ended the discrimination.

For similar reasons, institutional liability cannot be based on O'Malley's knowledge of the relationship. Although O'Malley at one point described the relationship between Striuli and Liu as "turbulent," Liu has produced no evidence that demonstrates that O'Malley knew the relationship was abusive or nonconsensual. In fact, Liu has not produced any other evidence that indicates what O'Malley knew about the relationship, other than his characterization of the relationship as "turbulent" in September 1995, after the relationship had ended. Furthermore, as Director of the Graduate History Department, O'Malley had no supervisory authority over Striuli, a professor in the Department of Modern Languages and, therefore, O'Malley lacked the type of authority required by *Gebser*.

Liu has failed entirely to demonstrate a cause of action under the standard enunciated by the Supreme Court in *Gebser* for vicarious liability under Title IX. Therefore, the College's Motion for Summary Judgment as to Count I is granted.

## 2. COUNTS VII & VIII: NEGLIGENCE

### a. The elements of a negligence cause of action

Two separate counts against the College in Liu's Amended Complaint are based on negligence theories. The two causes of action are labeled negligent infliction of emotional distress, a claim also asserted against Striuli, and negligent hiring and supervision. Both claims founder on an essential element of any cause of action grounded in negligence: proof that the defendant committed acts which constitute a breach of a duty owed the plaintiff.

It is hornbook law that to establish a cause of action for negligence, the plaintiff must demonstrate that the defendant owed the plaintiff a legal duty, that the defendant breached that duty, that the breach factually and legally caused the plaintiff harm, and that the plaintiff suffered a demonstrable loss therefrom. *See Splendorio v. Bilray Demolition Co.*, 682 A.2d 461, 466 (R.I.1996); W. Page Keeton et al., *Prosser & Keeton on The Law of Torts* § 30, at 164–65 (5th ed.1984). Analysis of a negligence claim by a court must begin with the identification of a legal duty owed by the defendant to the plaintiff to avoid committing negligent acts which might harm the plaintiff in a tangible way. If there is no duty owed the plaintiff, there is no liability for harm caused. *See Swajian v. General Motors Corp.*, 559 A.2d 1041, 1046 (R.I.1989) ("It is axiomatic to tort law that this duty goes to the very existence of liability.... One cannot logically be held liable for breach of a nonexistent duty."). Underlying the amorphous term "duty" is the legal concept of forseeability. *See Banks v. Bowen's Landing Corp.*, 522 A.2d 1222, 1225 (R.I.1987). Where the risk of injury to a party is reasonably foreseeable, the law will impose a duty upon the defendant to take reasonable steps to avoid that injury; in short, the potential risk is the measuring stick for the scope of the duty. *See Builders Specialty Co. v. Goulet*, 639 A.2d 59, 60 (R.I. 1994); *see also Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99, 100 (N.Y.1928) (Cardozo, C.J.) ("The risk reasonably to be perceived defines the duty to be obeyed, and

risk imports relation; it is risk to another or to others within the range of apprehension.").

### b. Negligent hiring under Rhode Island law

■ The Rhode Island Supreme Court has announced that an employer owes certain third parties a duty to protect them from harms inflicted by the employer's workers. *See Welsh Mfg. v. Pinkerton's, Inc.*, 474 A.2d 436, 440 (R.I.1984). Under this formulation of the employer's duty, liability for the harmful acts of employees is not premised on the doctrine of respondeat superior, but on a separate affirmative duty owed by the employer to third persons who may reasonably be expected to come into contact with the employees. *See Mainella v. Staff Builders Indus. Servs., Inc.*, 608 A.2d 1141, 1144–45 (R.I.1992); *Restatement (Second) of Agency* § 213 (1958); *Restatement (Second) of Torts* § 302B cmt. e (1965).

■ The Rhode Island Supreme Court has defined this independent duty in the following manner: "Liability of the employer is premised on its failure to exercise reasonable care in selecting a person who the employer knew or should have known was unfit or incompetent for the employment, thereby exposing third parties to an unreasonable risk of harm." *Welsh Mfg.*, 474 A.2d at 440. The *Welsh* Court explained that this duty lasts for the duration of the employee's tenure with the employer, affirming that employer liability can also be found in a breach of the "duty to retain in its service only those employees who are fit and competent." *Id.* at 441 (explaining that this extended duty encompasses causes of action for negligent supervision, negligent training, and negligent assignment).

■ There can be no doubt that as a matter of law, the College owes its students a duty to employ faculty and staff who are not reasonably foreseen to be dangers to the well-being of the student body. Liu's negligence claims, however, fail to pass muster under the summary judgment standard because she has not adduced enough evidence upon which a reasonable jury could conclude that the College breached that duty. Liu has presented no evidence at all that undermines

the process by which the College hired Striuli nine years before the alleged harassment. Furthermore, Liu has failed to even allege that there were facts in existence about Striuli at the time of his hiring which would have given the College a reason to believe that Striuli was a sexual harassment risk. *See Rodrigues v. Miriam Hosp.*, 623 A.2d 456, 464 (R.I.1993) (holding that the plaintiff must produce evidence indicating that a further inquiry by the employer would have revealed facts that would have alerted the employer to the danger of hiring the employee). No cause of action for negligent hiring can be maintained by Liu.

### c. Negligent supervision under Rhode Island law

Liu's claim of negligent supervision fares no better. Even when the facts are viewed in the light most favorable to Liu, this Court must conclude that she has adduced no evidence substantiating her charge that the College failed to do something that a reasonable institution of higher education would have done to prevent the alleged harassment by Striuli. In support of her negligent supervision claim, Liu stretches past the breaking point the Rhode Island case that first imposed such liability on an employer, as discussed below.

The Rhode Island Supreme Court established an employer's liability for negligent supervision in a case involving a rookie night watchman who had been assigned by his employer the task of guarding a valuable quantity of gold for a client of the employer. *See Welsh Mfg.*, 474 A.2d at 438. In that context, the Rhode Island Supreme Court held that the employer could be liable for theft by the watchman where there was evidence that the twenty-one year old guard had not been trained properly and was left unsupervised for long periods of time to guard the large cache of precious metal. *See id.* at 443. The extent of the employer's duty to supervise, according to the *Welsh* Court, was defined by the nature of the job to which the employee was assigned. In *Welsh*, a young and inexperienced guard was given "the sensitive task of guarding large quantities of gold." *Id.* at 441. The Rhode Island

Supreme Court held that the employer had breached its duty by failing to prepare and supervise the employee for the very task to which it assigned him. *See id.* at 443.

■ Liu has failed to adduce any evidence that the College committed negligent acts in supervising Striuli. Liu rests her entire cause of action for negligent supervision on one meager rumor: a deposition statement by Deasey describing a conversation he had with the President of the College when Liu's allegations had first come to light. At the deposition, Deasey claimed that the President of the College acknowledged that "there had been earlier complaints" about Striuli. Deasey said nothing more of substance in his deposition regarding the College's knowledge of harassment by Striuli. The inadequacies of this evidence are obvious. This fragmentary bit of hearsay is entirely lacking in content and context. The nature of the alleged complaints is unknown as well as their timing, seriousness, and number. No evidence produced by Liu makes more plausible the conclusion that the complaints related to sexual harassment than to classroom competence or any other subject. Although this Court does not demand that a plaintiff opposing a motion for summary judgment prove all of the facts which would support her cause of action, a claim of negligent supervision requires more evidence to survive the College's Motion for Summary Judgment than a solitary opaque rumor.

Under the facts of the case sub judice, the *Welsh* decision provides little support for Liu's claim. Unlike the employer of a young night watchman, a college is not expected to literally watch over the shoulders of its tenured faculty. Striuli was neither Liu's professor nor her supervisor. In order for a reasonable jury to find that the College was negligent in its supervision of Striuli, this Court would have to expand beyond all reason the duty owed by the College. The duty that Liu would have this Court impose upon the College, a duty that encompasses a requirement that the College must take affirmative steps to investigate the exact nature of each relationship between a faculty member and a student, is clearly beyond the scope of the *Welsh* decision. This Court declines Liu's invitation to so distort the *Welsh* standard.

Liu has done little more than allege that the College was negligent. " 'Mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact.' " *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir.1993) (quoting *August v. Offices Unlimited, Inc.*, 981 F.2d 576, 580 (1st Cir. 1992)). The evidence that Liu has marshaled in support of the breach of duty element of her negligence claims does not rise above the "mere scintilla" standard for measuring the sufficiency of the plaintiff's evidence on a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Like the claim of negligent hiring, the cause of action for negligent supervision fails.

### d. Negligent infliction of emotional distress under Rhode Island law

■ An extended analysis of the elements of Liu's third theory of negligence, negligent infliction of emotional distress, is unnecessary because it also is insufficient due to Liu's complete failure to produce any evidence that the College breached its duty to her, as discussed above in the analysis of her cause of action for negligent hiring and supervision. As for each of the negligence causes of action, it is not enough for Liu to allege that the College "should have known" that Striuli was sexually harassing her. Liu must point to specific facts in the record which would allow a reasonable jury to conclude that the College should have discovered evidence of Striuli's alleged acts of sexual harassment. She has not done so.

Neither of Liu's causes of action against the College based on negligence can withstand the College's dispositive motion. The College's Motion for Summary Judgment is therefore granted as to Counts VII and VIII.

### 3. COUNT III: RHODE ISLAND CIVIL RIGHTS ACT

In her final claim against the College, Liu seeks to impose vicarious liability under the Rhode Island Civil Rights Act of 1990 ("RI-CRA"), R.I.Gen.Laws §§ 42–112–1 to –2, on the institution for Striuli's allegedly harassing conduct. No decision of the Rhode Island Supreme Court speaks directly to this issue. In fact, there is precious little case law addressing the scope of RICRA in any respect. This Court, therefore, will analyze useful state and federal authorities in order to shape an informed prediction of how the Rhode Island Supreme Court would answer the question before the Court. *See Spurlin v. Merchants Ins. Co.,* 57 F.3d 9, 11 (1st Cir. 1995) (explaining that when state authorities do not directly answer the question in controversy, the federal court must make its "best guess" as to what the state court would hold).

RICRA was created as a direct response to the United States Supreme Court's decision in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). *See Ward v. City of Pawtucket,* 639 A.2d 1379, 1381 (R.I.1994) (explaining that RICRA was enacted in response to *Patterson's* narrow interpretation of 42 U.S.C. § 1981). In *Patterson,* the United States Supreme Court held that the federal Civil Rights Act of 1866, 42 U.S.C. § 1981, protects against racial discrimination in the formation of contracts only and not in the subsequent modification and performance of contracts. *See Patterson,* 491 U.S. at 171, 109 S.Ct. 2363. Rhode Island soon thereafter enacted RICRA which provides that "[a]ll persons within the state, regardless of race, color, religion, sex, disability, age, or country of ancestral origin, shall have . . . the same rights to make and enforce contracts. . . ." R.I.Gen.Laws § 42–112–1(a). The statute adopts a more expansive definition of contractual rights than does federal § 1981 under the *Patterson* Court's interpretation. The Rhode Island statute defines those rights to include "the making, performance, modification and termination of contracts . . . and the enjoyment of all benefits, terms, and conditions of the contractual and other relationships." *Id.* § 42–112–1(b).

These civil rights are enforceable by a private right of action expressly authorized by the statute: "A person whose rights under the provision of § 42–112–1 have been violated may commence a civil action for injunctive and other appropriate equitable relief, and for the award of compensatory and exemplary damages." *Id.* § 42–112–2. The statute also provides that an "aggrieved person" who prevails in such an action may recover reasonable attorneys' fees. *See id.*

This Court rejects Liu's contention that the College can be held vicariously liable under RICRA. Liu would have this Court import into its analysis of liability under RICRA, enacted in 1990, the standards used for employer liability under federal Title VII case law developed by the United States Supreme Court in 1998. If this Court were to establish such liability on the facts of this case, it would be expanding beyond recognition the rules of employer tort liability that have been repeatedly applied by the Rhode Island Supreme Court for decades.

■ This Court holds that although the Rhode Island Supreme Court has never addressed the issue, if faced with the question, it would likely conclude that RICRA can be violated only by intentional discrimination, and not by mere negligent acts. This conclusion is reached by resort to federal case law interpreting the federal counterpart to RICRA, 42 U.S.C. § 1981. These decisions of the federal courts hold that § 1981 may only be violated by intentional discrimination. *See General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Alexis v. McDonald's Restaurants,* 67 F.3d 341, 346 (1st Cir.1995). Limiting violations of RICRA to intentional acts necessarily forecloses vicarious liability for RICRA violations given Rhode Island's law on the doctrine of respondeat superior.

■ Under the traditional tort rule recognized in Rhode Island, an employer generally is not liable for the intentional tortious conduct of an employee. *See Drake v. Star Market Co.,* 526 A.2d 517, 519 (R.I. 1987); *Labossiere v. Sousa,* 87 R.I. 450, 143 A.2d 285, 287 (R.I.1958); *Bryce v. Jackson*

*Diners Corp.,* 80 R.I. 327, 96 A.2d 637, 639 (R.I.1953); Keeton et al., *supra,* § 70, at 505–07 (explaining that vicarious liability attaches only when an employee's intentional torts were committed in furtherance of the employer's business). There is at least one commonly recognized exception to this general rule, however. An employer may be liable for the intentional tort of an employee if the tort was committed while "performing a duty in the course of his employment and by express or implied authority from the employer." *Drake,* 526 A.2d at 519. Typically, an employer held liable under this exception to the general rule was aware, or should have been aware, that the nature of the employee's official tasks involved a substantial risk that the employee might inflict upon a third party an intentional tort in the course of furthering the employer's business. *See Bryce,* 96 A.2d at 640. No other exception has been recognized by the Rhode Island Supreme Court for holding employers vicariously liable for the intentional torts of their employees. *See Pride Chrysler Plymouth, Inc. v. Rhode Island Motor Vehicle Dealers' License Comm'n,* 721 F.Supp. 17, 23 (D.R.I. 1989) (acknowledging that under Rhode Island law an employer can be held liable for an employee's intentional torts only under the exception recognized in *Drake* ).

Some employers have been held liable under negligence theories for employees' intentional torts. As discussed above, the Rhode Island Supreme Court has recognized employer liability for negligent hiring, training, and supervision. *See Mainella v. Staff Builders Indus. Servs., Inc.,* 608 A.2d 1141, 1144 (R.I.1992); *Welsh Mfg. v. Pinkerton's, Inc.,* 474 A.2d 436, 440–41 (R.I.1984). However, the College cannot be liable under RICRA under such a theory because this Court has already decided that the College committed no negligent acts with respect to Striuli's employment.

The express language of RICRA's private right of action provision does not shed any light on the question of vicarious employer liability. *See* R.I.Gen.Laws § 42–112–2 (granting a right of action to those who have been denied their rights under the statute). Given the reluctance of the Rhode Island

Supreme Court to hold employers liable absent employer negligence or an act in furtherance of the employer's business, this Court can only conclude that the Rhode Island Supreme Court would not import theories of vicarious liability into RICRA in this type of case. Therefore, the College's Motion for Summary Judgment as to Count III is granted.

## B. MOTION FOR SUMMARY JUDGMENT BY STRIULI

### 1. RES JUDICATA DEFENSE

Before dealing with Striuli's specific assaults on particular counts contained in Liu's Amended Complaint, the Court will first address a global defense raised by Striuli that targets all of the counts charged against him. In an attempt to forestall consideration of Liu's Amended Complaint on the merits, Striuli argues that all of the causes of action contained in Liu's pleading are barred by the doctrine of res judicata. This ambitious broadside misses its mark entirely.

According to Striuli, the claims against him contained in the lawsuit sub judice are barred by res judicata because Liu should have included all of them in the action she commenced on August 31, 1995 in the Rhode Island District Court for a temporary order of protection. The proceeding before the Rhode Island District Court was brought pursuant to a special statutory scheme allowing for speedy access to the courts for victims of domestic violence. *See* R.I.Gen.Laws §§ 8–8.1–1 to –8.

▆ Although Striuli has styled his defense as res judicata, the more precise description of his challenge is claim preclusion. When used as a general term, res judicata encompasses two distinct theories of preclusion: claim preclusion and issue preclusion. The definitive distinction between these theories is explained by the *Restatement (Second) of Judgments* §§ 24 (claim preclusion), 27 (issue preclusion) (1982), a source recognized as authoritative on the doctrine of res judicata by both the Rhode Island Supreme Court and the United States Court of Appeals for the First Circuit, *see ElGabri v.*

*Lekas,* 681 A.2d 271, 275–77 (R.I.1996); *United States v. American Heart Research Found., Inc.,* 996 F.2d 7, 11 (1st Cir.1993).

Claim preclusion acts to bar from re-litigation claims that were actually litigated in a prior lawsuit or that could have been litigated in that prior lawsuit. *See Rhode Island Student Loan Auth. v. NELS, Inc.,* 600 A.2d 717, 720 (R.I.1991). The general rule of claim preclusion is authoritatively stated in the *Restatement (Second) of Judgments:* "When a valid and final personal judgment is rendered in favor of the plaintiff: (1) The plaintiff cannot thereafter maintain an action on the original claim or any part thereof...." *Restatement (Second) of Judgments* § 18. The doctrine of claim preclusion bars more than just the original cause of action brought by the plaintiff, it also bars "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Id.* § 24(1). In order to invoke the preclusive effect of a prior suit, the party raising a claim preclusion defense must demonstrate that " 'there exists identity of parties, identity of issues, and finality of judgment in an earlier action.' " *Gaudreau v. Blasbalg,* 618 A.2d 1272, 1275 (R.I.1993) (quoting *In re Sherman,* 565 A.2d 870, 872 (R.I.1989)).

Claim preclusion is not, however, a wholly-inflexible legal doctrine. The *Restatement* recognizes several broad exceptions to the general rule. *See Restatement (Second) of Judgments* § 26 (listing exceptions). One of those exceptions provides that:

When any of the following circumstances exists, the general rule of § 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant:

. . . .

(d) The judgment in the first action was plainly inconsistent with the fair and equitable implementation of a statutory or constitutional scheme, or it is the sense of the scheme that the plaintiff should be permitted to split his claim....

*Id.* § 26(1)(d). An illustration of this exception provided by the *Restatement* editors involves a summary proceeding for repossession. In the example, a landlord brings a summary action for repossession of land from a tenant who has failed to pay rent. *See id.* § 26 cmt. e, ill. 5. In a separate, later action, the landlord sues for payment of rent past due. The *Restatement* editors conclude that the second action is not precluded if the statutory scheme under which the landlord brought the first action discloses an intention to provide an expedited procedure for reclaiming land without foreclosing other possible causes of action. *See id.* That exception is applicable to the special summary proceedings initiated by Liu for a protective order.

Upon the advice of the police officers who responded to her call for help the night Striuli came to her door demanding to be let in, Liu filed a complaint for a restraining order in the Rhode Island courts. The Rhode Island statute provides that "[a] person suffering from domestic abuse" may file a complaint for a protective order. *See* R.I.Gen.Laws § 8–8.1–3. Subject matter jurisdiction for protective order proceedings is vested in the District Court of the State of Rhode Island. *See id.* § 8–8.1–2 ("Proceedings under this chapter shall be filed, heard, and determined in the district court of the division in which the plaintiff resides."). Temporary protective orders, granted ex parte, are also allowed by the statute under certain circumstances. *See id.* § 8–8.1–4. The district court may impose in its discretion a range of restrictions on a domestic abuser, *see id.* § 8–8.1–3, after finding that the petitioner was the victim of domestic abuse, as defined by the statute, inflicted by the target of the order, *see id.* § 8–8.1–1(3) (defining domestic abuse).

The statutory scheme under which Liu initiated her first suit against Striuli is designed to provide victims of domestic violence quick access to the courts for protective orders. *See id.* § 8–8.1–4 (allowing for ex parte temporary protective orders); *see also* Catherine F. Klein & Leslye E. Orloff, *Providing Legal Protection for Battered Women: An Analysis of State Statutes and Case Law,* 21 Hofstra L.Rev. 801, 1052 (1993) ("These

relaxed procedures to avoid delay in issuance or implementation of the order are essential in cases of domestic violence, where the victim's emergency needs predominate."). In addition to allowing ex parte determination of a temporary protective order, other features of the protective order Act that evidence a legislative intention to provide speedy access to the courts include the waiver of filing fees for those unable to pay them and the lack of a minimum residency requirement for the petitioner. *See* R.I.Gen.Laws § 8–8.1–2. Furthermore, a complaint for a temporary order may be filed "[w]hen the court is unavailable after the close of business" before "any available district court judge" in an ex parte proceeding. *Id.* § 8–8.1–4(b)(1).

Most importantly, the statute itself sanctions splitting a cause of action. The Act declares: "Any proceedings under this chapter shall not preclude any other available civil or criminal remedies." *Id.* § 8–8.1–2. This statutory scheme, intended to provide victims of domestic abuse protection from immediate physical harm, is just the type of legal proceeding meant to be exempted from the claim preclusion rules by the *Restatement. See Restatement (Second) of Judgments* § 26(1)(d). Like the summary statutory proceeding for eviction discussed in the *Restatement* illustration, the protective order Act is designed to resolve a single, immediate concern of the petitioner without foreclosing the possibility of judicial relief on other issues. Liu sought the protection of the statute under the advice of local police officers responding to her call on the night Striuli attempted to force his way into her apartment. Under these circumstances, and given the public policy underlying the statute, it would be inequitable to maintain that Liu should have joined to this summary protective proceeding all state and federal claims that she may have had. Therefore, Striuli's Motion for Summary Judgment as to all

counts based on the general defense of res judicata is denied.

## 2. COUNT I: TITLE IX

▮ In addition to her attempt to hold the College liable under Title IX for Striuli's alleged sexual harassment, Liu also argues that Striuli can be held accountable individually under that statute. There is no merit in Liu's argument. The United States Court of Appeals for the First Circuit has foreclosed holding individuals liable under Title IX in their personal capacities. *See Lipsett v. University of Puerto Rico,* 864 F.2d 881, 901 (1st Cir.1988).

In *Lipsett,* a medical resident brought a suit against the public university hospital at which she trained and against individual doctors who sexually harassed her on the job. *See id.* at 884. In discussing the liability of the doctors in their individual capacities for sexual harassment under federal law, the Court of Appeals explained:

> In implying a cause of action under Title IX, the Supreme Court has considered only actions against the educational institution itself. *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Accordingly, the separate liability of the supervisory officials at the University must be established, if at all, under section 1983, rather than under Title IX.

*Lipsett,* 864 F.2d at 901.

The *Lipsett* decision is controlling in this circuit on Striuli's liability and, therefore, he cannot be held liable individually under Title IX. Nearly all other federal courts that have reached the issue have also held that Title IX recognizes no individual liability for sexual harassment in an educational setting. *See Smith v. Metropolitan Sch. Dist.,* 128 F.3d 1014, 1018–20 (7th Cir.1997) (collecting cases). Striuli's Motion for Summary Judgment as to Count I is granted.[4]

---

4. Attempts to analogize individual liability under Title IX to supervisor liability under Title VII are fruitless. Although this Court has held that a supervisor may be liable personally to a victim of sexual harassment under Title VII for his own acts of harassment, *see Wyss v. General Dynamics Corp.,* 24 F.Supp.2d 202, 205 (D.R.I.1998); *Ia-*

*campo v. Hasbro, Inc.,* 929 F.Supp. 562, 572 (D.R.I.1996), the reasoning supporting those decisions is inapposite to analysis of liability under Title IX. The differences between the purposes of the statutes are apparent. Title VII aims to hold liable to their victims individuals who discriminate in ways prohibited by federal law. *See*

## 3. COUNT II: VIOLENCE AGAINST WOMEN ACT

Liu also seeks relief under the Civil Rights Remedies for Gender Motivated Violence Act ("GMVA"), the civil remedies provision of the Violence Against Women Act ("VAWA"), a federal statute passed in 1994. *See* 42 U.S.C. § 13981 (providing a civil right of action to victims of gender-motivated crimes of violence). In objecting to this count, Striuli asks this Court to strike down the VAWA as unconstitutional.

■ This Court will not leap headlong into the constitutional fray. Federal courts are duty-bound to exercise judicial restraint when facing constitutional challenges to laws enacted by the majoritarian components of our republican form of government. The United States Supreme Court has counseled that "prior to reaching any constitutional questions, federal courts must consider non-constitutional grounds for decision." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). Accordingly, this Court must first determine whether Liu has constructed a valid cause of action under the GMVA. *See Doe v. Hartz,* 970 F.Supp. 1375, 1390 (N.D.Iowa 1997) (analyzing the constitutionality of the GMVA only after holding that a valid cause of action had been stated). Only then will this Court pass judgment on the Act's constitutionality.

### a. Stating a cause of action under the GMVA

■ Congress passed the GMVA, a subtitle of the VAWA, as a supplement to existing federal and state remedies for victims of violent crimes motivated by gender. *See* S.Rep. No. 103–138, at 51 (1993) (GMVA is not a substitute for state tort law); *id.* at 53

(GMVA is not a substitute for liability under Title VII); *see also Palazzolo v. Ruggiano,* 993 F.Supp. 45, 47 (D.R.I.1998). Congress explained that the Act's purpose was to "protect the civil rights of victims of gender motivated violence and to promote public safety, health, and activities affecting interstate commerce." 42 U.S.C. § 13981(a). The Act provides for the recovery of compensatory and punitive damages, as well as injunctive and declaratory relief. *See id.* § 13981(c).

The Act declares that "[a]ll persons within the United States shall have the right to be free from crimes of violence motivated by gender." *Id.* § 13981(b). The GMVA establishes that any person who violates another's rights under the Act by committing an act of violence motivated by gender may be civilly liable under the Act to the victim. *See id.* at § 13981(c).

■ Therefore, to state a valid cause of action under the GMVA, Liu must establish two elements: (1) that she was the victim of a crime of violence as defined by the statute and (2) that the perpetrator of the crime was motivated to commit the crime because of Liu's gender. *See id.* The Act provides definitions for the key terms in the two elements.

For the purposes of the GMVA, a "crime of violence" is defined as:

(1) "an act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another" and

(2) "would come within the meaning of State or Federal offenses described in sec-

---

*Landgraf v. USI Film Prods.,* 511 U.S. 244, 254, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (explaining that Title VII seeks to "mak[e] persons whole for injuries suffered through past discrimination"). In contrast, Title IX by its own terms applies only to educational programs that receive federal financial assistance. *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, ——, 118 S.Ct. 1989, 1997, 141 L.Ed.2d 277 (1998). Therefore, "[t]he fact that Title IX was enacted pursuant to Congress's spending power is evidence that it prohibits discriminatory acts only by grant recipients." *Rowinsky v.*

*Bryan Indep. Sch. Dist.,* 80 F.3d 1006, 1012 (5th Cir.1996). Furthermore, unlike Title VII, which grants an express private right of action to victims of sexual harassment on the job, the only remedies expressly included in Title IX are administrative powers to withhold federal funding from the recipient institution. *See* 20 U.S.C. § 1682 (allowing enforcement of the statute's anti-discrimination provisions by the termination of federal funding); *see also Cannon,* 441 U.S. at 688–89, 99 S.Ct. 1946 (recognizing an implied private right of action under Title IX against educational institutions that discriminate on the basis of sex).

tion 16 of Title 18," which requires that the offense either

(a) include "as an element the use, attempted use, or threatened use of physical force against the person or property of another" or

(b) "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

*Id.* § 13981(d)(2)(A); 18 U.S.C. § 16. The statute further provides that acts may qualify as crimes of violence under the GMVA "whether or not those acts have actually resulted in criminal charges, prosecution, or conviction." 42 U.S.C. § 13981(d)(2)(A).

■ The statute also provides some guidance for the meaning of the term "crime of violence motivated by gender." Such a crime is (1) "committed because of gender or on the basis of gender" and (2) is "due, at least in part, to an animus based on the victim's gender." *Id.* § 13981(d)(1). Random acts of violence, however, do not satisfy the gender motive requirement and, therefore, cannot support a civil cause of action under the statute. *See id.* § 13981(e)(1); S.Rep. No. 103–138, at 49 ("The committee is not asserting that all crimes against women are gender-motivated.").

■ Whether the requisite gender-motivated animus is present in a given case is a question of fact to be determined from the totality of the circumstances. However, the precise meaning of the term as it is used in the statute is unclear. This Court has no trouble finding that the term[ ] "animus" as used in the statute is ambiguous. *See Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 320, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (Stevens, J., dissenting) ("The term 'animus' ... [is] susceptible to different interpretations.") (considering the term in the context of 42 U.S.C. § 1985(3)); *Hartz,* 970 F.Supp. at 1406 (finding the word "animus" as used in the GMVA ambiguous). Accordingly, this Court may turn to Congressional history in the hope that it may illuminate the meaning of this nebulous term. *See Barnhill v. Johnson,* 503 U.S. 393, 401, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992); *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649, 654 (1st Cir.1997).

■ The Congressional record of the proceedings in which Congress considered the GMVA indicates that Congress intended that the courts seek guidance from Title VII case law in determining whether a plaintiff has proven the motive element of a cause of action under the GMVA. *See Crisonino v. New York City Hous. Auth.,* 985 F.Supp. 385, 391 (S.D.N.Y.1997); S.Rep. No. 103–138, at 52 (stating that proof of gender motivation "should proceed in the same ways proof of race or sex discrimination proceeds under other civil rights laws"). Courts interpreting the requirement of gender-motivated conduct for purposes of Title VII liability have held that proof of unwelcomed sexual advances is sufficient to meet the intent element of that statute. *See, e.g., Kinman v. Omaha Pub. Sch. Dist.,* 94 F.3d 463, 467 (8th Cir.1996) (explaining that unwelcome sexual advances may constitute part of a hostile environment sexual harassment claim). Furthermore, Congress identified several factors that courts should consider in analyzing whether a crime was gender-motivated: "Language used by the perpetrator; the severity of the attack (including mutilation); the lack of provocation; previous history of similar incidents; absence of any other apparent motive (battery without robbery, for example); common sense." S.Rep. No. 103–138, at 52 n. 61.

### b. Liu's claim under the GMVA

Viewing the facts in the record in the light most favorable to Liu, this Court concludes that she has adduced enough evidence to defeat Striuli's dispositive motion on her GMVA cause of action. Although Liu has not specified what felony Striuli committed to satisfy the GMVA's requirement of proof of a predicate crime of violence, the Court will assume that Liu's allegations of rape indicate an intent to base her GMVA claim on Rhode Island's sexual assault statutes.

■ Liu has satisfied the "crime of violence" element of 42 U.S.C. § 13981(c) by setting forth some proof, in the form of her own affidavits, of rape by Striuli, which amounts to first or second degree sexual assault under Rhode Island law. First de-

gree sexual assault occurs when the accused "engages in sexual penetration with another person" and, inter alia, "uses force or coercion" to accomplish the crime. R.I.Gen.Laws § 11–37–2. Rhode Island law defines second degree sexual assault as "sexual contact with another person" when, inter alia, "[t]he accused uses force or coercion." *Id.* § 11–37–4.

Under the statute, "sexual contact" includes "the intentional touching of the victim's or accused's intimate parts, clothed or unclothed, if that intentional touching can be reasonably construed as intended by the accused to be for the purpose of sexual arousal, gratification, or assault." *Id.* § 11–37–1(7). The statute also defines the phrase "force or coercion" to mean, inter alia, that the perpetrator "[o]vercomes the victim through the application of physical force or physical violence." *Id.* § 11–37–1(2)(B). Force is enough to overcome the victim when the victim " 'offer[s] such resistance as seems reasonable under all the circumstances.' " *State v. Goodreau,* 560 A.2d 318, 322–23 (R.I. 1989) (quoting *State v. Carvalho,* 122 R.I. 461, 409 A.2d 132, 135–36 (1979)). However, "[a]ny conduct making it clear that the victim does not consent to the contact is sufficient." *Palazzolo,* 993 F.Supp. at 48 (applying Rhode Island law); *see Goodreau,* 560 A.2d at 322–23.

The penalty for first degree sexual assault is a prison sentence of not less than ten years with an upper limit of life imprisonment. *See* R.I.Gen.Laws § 11–37–3. Second degree sexual assault is punishable by a prison sentence of not less than three years and not more than fifteen. *See id.* § 11–37–5. State law categorizes offenses with such penalties as felonies. *See id.* § 11–1–2 (defining felonies as crimes punishable by imprisonment for more than one year).

Liu alleges that on numerous occasions beginning in the fall of 1994, Striuli forced her to engage in sexual intercourse with him. Specifically, Liu alleges that on October 13, 1994, Striuli telephoned her and insisted on visiting her at home. Undeterred by her attempts to stave him off with excuses of a heavy workload, Striuli came to her apartment. Liu pretended not to be at home, but she relented when Striuli pounded on her door and called to her to let him in. While still in the hallway of her apartment, Liu alleges that Striuli shoved her to the floor, tore off her outer and under garments, and raped her; all the while telling her that "you want this." Liu alleges that Striuli would use physical power to coerce her into having sexual intercourse with him, acts which Liu describes as unwelcomed "forced sex." She has alleged that in order to force her into sex Striuli would twist her arm, inflicting great pain, and pin her legs apart with his body. These allegations of forced sexual intercourse, following Liu's attempts to avoid seeing Striuli, are sufficient to satisfy the GMVA's predicate crime of violence requirement because the conduct Liu accuses Striuli of would constitute, if true, first or second degree sexual assault, both felonies against the person under Rhode Island law that include the use of physical force. *See State v. Pignolet,* 465 A.2d 176, 184 (R.I.1983) (holding that evidence showing that the defendant forced the victim to the ground, prevented her from getting up, and pushed apart her legs with his own was sufficient to establish a sexual assault under Rhode Island law).

The second element of a cause of action under the GMVA, that the crime of violence be gender-motivated, is also satisfied under the facts before the Court. The pattern of physical and emotional abuse by Striuli alleged by Liu, including the rapes, the lewd comments, the threats of deportation, along with the lack of any other apparent motive, is sufficient to warrant the conclusion that Striuli's conduct was gender-motivated. *See EEOC v. Farmer Bros. Co.,* 31 F.3d 891, 898 (9th Cir.1994) ("[S]exual harassment may be symptomatic of gender-based hostility, the employer or supervisor using sexual harassment primarily to subordinate women ... and to demean them."); *Anisimov v. Lake,* 982 F.Supp. 531, 541 (N.D.Ill.1997) (holding that allegations of repeated unwelcome sexual advances and, ultimately, a rape satisfy the gender-motivation element of the GMVA); *Hartz,* 970 F.Supp. at 1408 ("[U]nwanted or unwelcome sexual advances may be demeaning and belittling, and may reasonably be inferred to be intended to have that purpose or to relegate another to an inferior status,

even if the advances were also intended to satisfy the actor's sexual desires. . . . "). For the purposes of this Motion, Liu has carried her burden of adducing enough evidence to maintain a cause of action under the GMVA.

### c. Constitutionality of the GMVA

■ All of the federal courts, save one, that have addressed the issue have denied constitutional challenges to the civil remedies provisions of the VAWA. *See Ziegler v. Ziegler,* 28 F.Supp.2d 601 (E.D.Wash.1998); *Crisonino v. New York City Hous. Auth.,* 985 F.Supp. 385, 393–97 (S.D.N.Y.1997); *Anisimov v. Lake,* 982 F.Supp. 531, 540 (N.D.Ill. 1997); *Seaton v. Seaton,* 971 F.Supp. 1188, 1192–95 (E.D.Tenn.1997); *Doe v. Hartz,* 970 F.Supp. 1375, 1423 (N.D.Iowa 1997); *Doe v. Doe,* 929 F.Supp. 608, 617 (D.Conn.1996).[5] The one district court that concluded that the statute was unconstitutional was reversed by its circuit court, which soon thereafter granted a petition for rehearing en banc and vacated its own decision, leaving the matter unsettled in that circuit. *See Brzonkala v. Virginia Polytechnic & State Univ.,* 935 F.Supp. 772 (W.D.Va.1996) (striking down as unconstitutional the GMVA), *rev'd,* 132 F.3d 949, 974 (4th Cir.1997), *reh'g en banc granted and opinion vacated* (Feb. 5, 1998). This Court concludes that the constitutionality of the civil remedies provisions of the VAWA has been thoroughly demonstrated by the several federal district courts that have analyzed the issue. Therefore, this Court will forego a lengthy examination of the question and refer readers seeking further guidance to the more detailed analyses of the courts listed above. This Court will, however, briefly assay the case for the constitutionality of the GMVA.

The United States Constitution provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cls. 1, 3. This power has been expansively interpreted by the United States Supreme Court throughout this century. *See, e.g., Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 87

L.Ed. 122 (1942) (denying a constitutional challenge to the imposition of the Agricultural Adjustment Act of 1938 to locally-consumed wheat); *National Labor Relations Bd. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 36–41, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (denying a constitutional attack on the National Labor Relations Act). The federal courts have afforded Congress great deference in the exercise of its powers under the Commerce Clause. *See United States v. Lopez,* 514 U.S. 549, 553–58, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (reviewing the history of the Supreme Court's application of the Commerce Clause to acts of Congress); *Mistretta v. United States,* 488 U.S. 361, 384, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (warning that an act of Congress may be invalidated by the courts only "for the most compelling constitutional reasons"). This Court must heed the Supreme Court's directive and limit its inquiry, for "[t]he task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow." *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). This is so because congressional power under the Commerce Clause is "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution." *Gibbons v. Ogden,* 22 U.S. (9 Wheat) 1, 196, 6 L.Ed. 23 (1824) (Marshall, C.J.).

Nevertheless, it is the duty of the federal courts to ultimately determine whether Congress has exceeded the scope of its Constitutionally-defined powers. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) (Marshall, C.J.) (declaring that it is the judiciary's duty "to say what the law is"). Despite the deferential review of Congressional acts that has become the standard for Commerce Clause analysis, the United States Supreme Court has imposed limits on the power of Congress to regulate commercial activity. *See Lopez,* 514 U.S. at 567–68, 115 S.Ct. 1624.

---

5. In addition, two other federal district courts have sustained plaintiffs' claims under the VAWA while not directly addressing the constitutionality of the Act. *See Kuhn v. Kuhn,* 1998 WL 673629,

at * 5–7 (N.D.Ill. Sept.16, 1998); *Mattison v. Click Corp. of America,* 1998 WL 32597, at *6–7 (E.D.Pa. Jan.27, 1998) (unreported decision).

The *Lopez* Court identified three types of activity that Congress may regulate under its Commerce Clause power: (1) the "use of the channels of interstate commerce"; (2) the "instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." *Id.* at 558–59, 115 S.Ct. 1624 (citation omitted). Only the third category can supply a justification for the VAWA, therefore, the Court will analyze the statute under the tests applicable to regulations "substantially affecting interstate commerce." *See Crisonino,* 985 F.Supp. at 394 (analyzing the VAWA under the third category identified by *Lopez* ); *Anisimov,* 982 F.Supp. at 537 (same); *Hartz,* 970 F.Supp. at 1415 (same); *Doe,* 929 F.Supp. at 612 (same).

The Supreme Court has developed a two-part test for reviewing the constitutionality of an act of Congress that can only be justified under *Lopez's* third category of constitutionally-permissible regulation of commerce. First, the Court must determine whether Congress had a rational basis for concluding that the regulated activity affects interstate commerce. *See Lopez,* 514 U.S. at 557, 115 S.Ct. 1624; *Hodel,* 452 U.S. at 276, 101 S.Ct. 2352. Second, the Court must conclude that the means chosen by Congress to regulate the activity are reasonably adapted to the ends permitted by the Constitution. *See Hodel,* 452 U.S. at 276, 101 S.Ct. 2352; *Heart of Atlanta Motel, Inc. v. U.S.,* 379 U.S. 241, 262, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).

This Court concludes that Congress did have a rational basis for finding that gender-motivated crimes of violence have a substantial effect on interstate commerce. Evidence of this substantial effect can be found in the voluminous reports produced by Congress following four years of evidentiary hearings on the subject. *See* H.R.Rep. No. 103–711 (1994), U.S.Cong. & Admin.News 1994, p. 1802; S.Rep. No. 103–138 (1993); S.Rep. No. 102–118 (1992); S.Rep. No. 102–197 (1991); S.Rep. No. 101–545 (1990). This Court need not summarize the findings of Congress since that task has been done elsewhere, *see Hartz,* 970 F.Supp. at 1421–22, but the ultimate conclusion of Congress is to the point: "[C]rimes of violence motivated by gender have a substantial effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting business ... in interstate commerce...." H.R.Rep. No. 103–711, at 385, U.S.Cong. & Admin.News 1994 at 1853. This Court is mindful, however, that it need not accept as true the legislative assertion that an activity substantially affects interstate commerce merely because Congress says so. This Court must make an "independent evaluation of constitutionality" under the rational basis test. *Lopez,* 514 U.S. at 562, 115 S.Ct. 1624; *see Hodel,* 452 U.S. at 311, 101 S.Ct. 2352 (Rehnquist, J., concurring) ("[T]he connection with interstate commerce is itself a jurisdictional prerequisite for any substantive legislation by Congress under the Commerce Clause."); *Heart of Atlanta Motel, Inc.,* 379 U.S. at 273, 85 S.Ct. 348 (Black, J., concurring) (advising that the interstate commerce inquiry is "ultimately a judicial rather than a legislative question"). In making this evaluation, the Court may "of course consider legislative findings, and indeed even congressional committee findings, regarding effect on interstate commerce." *Lopez,* 514 U.S. at 562, 115 S.Ct. 1624. Furthermore, empirical findings of Congress on complex questions of policy must be afforded "great weight" by this Court. *See Metro Broad. Inc. v. FCC,* 497 U.S. 547, 569, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990).

Based on the extensive empirical findings of Congress cited above, this Court cannot conclude that Congress had no rational basis for finding that gender-motivated violence substantially affects interstate commerce. This Court is not in the business of second-guessing the wisdom of acts of Congress. *See U.S. v. Kirk,* 105 F.3d 997, 999 (5th Cir.1997) ("[W]e must discipline our scrutiny to ensure that we are about the business of judicial review and not the business of social policy."). The task before the Court is a very narrow one and is "restricted to the issue whether any state of facts either known or which could reasonably be assumed

affords support for" the conclusion reached by the Congress. *United States v. Carolene Prods. Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). This Court is satisfied that Congress had a rational basis for concluding that gender-motivated crimes of violence have a substantial effect on interstate commerce.

The second step in reviewing the constitutionality of the civil remedies provisions of the VAWA requires this Court to determine whether the means chosen by Congress are "reasonably adapted" to the goals of the legislation. *Hodel*, 452 U.S. at 276, 101 S.Ct. 2352. This Court can discern no constitutional infirmity in the civil remedies provisions of the VAWA under the second prong of Commerce Clause analysis.

After several years of hearings involving countless experts from across a wide spectrum of disciplines, Congress concluded that "traditional state law sources of protection have proved to be difficult avenues of redress for some of the most serious crimes against women." S.Rep. No. 103–138, at 49. Congress also concluded that "[s]tate and federal criminal laws do not adequately protect against the bias element of crimes of violence motivated by gender, which separates these crimes from acts of random violence." H.R.Rep. No. 103–711, at 385. Faced with the problem of inadequate enforcement mechanisms for anti-bias laws, Congress turned to a tried-and-true solution: the private attorney-general. This method of enforcing civil rights statutes, granting private litigants the statutory power to protect their own civil rights through the courts, has been adopted by Congress in other statutory schemes and has continually received the approval of the federal courts. *See, e.g., EEOC v. Wyoming*, 460 U.S. 226, 243, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (upholding the Age Discrimination in Employment Act of 1967); *Katzenbach v. McClung*, 379 U.S. 294, 304–05, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (upholding Title II of the Civil Rights Act of 1964). Based on this history, this Court can only conclude that this method of enforcement of the VAWA is reasonable. Accordingly, Striuli's constitutional challenge to the GMVA is rejected, and, therefore, his

Motion for Summary Judgment as to Count II is denied.

### 4. COUNT III: RHODE ISLAND CIVIL RIGHTS ACT

Striuli argues that Liu cannot maintain a cause of action against him under the Rhode Island Civil Rights Act of 1990, R.I.Gen.Laws §§ 42–112–1 to –2 ("RICRA"), because it allows an action for discriminatory interference with contractual rights only against a party to that contract. Striuli urges an overly-narrow interpretation of the statute and one that this Court declines to adopt.

The language of RICRA is decidedly victim-oriented. The Act does not prohibit persons from engaging in discriminatory acts, rather, it affirms certain rights and grants victims a cause of action if "aggrieved." R.I.Gen.Laws § 42–112–2. Furthermore, the statute does not expressly limit liability to parties to a contract, nor does it specifically fix liability upon a certain class of persons. The language is uniformly broad.

Given the expansive language of RICRA and its generous grant of rights, this Court can discern no basis for limiting liability under the statute to parties to the contract interfered with. This Court has held as much previously. *See Iacampo v. Hasbro, Inc.*, 929 F.Supp. 562, 573 (D.R.I.1996) (holding liable under RICRA two supervisors for improperly interfering with an employee's contractual rights with her employer). "The decision in *Ward* mandates that courts read the RICRA as broadly as possible—which means that if individuals discriminate in ways that violate the statute, then they must be liable under it." *Id.; see Ward*, 639 A.2d at 1381–82. One limit upon liability, however, is likely to be acknowledged by the Rhode Island Supreme Court. As discussed above in the context of the College's potential liability under RICRA, vicarious liability principles are unlikely to be imported into the right of action created by RICRA given the substantial common law in Rhode Island limiting employer liability under the various doctrines of respondeat superior.

■ Liu has adduced enough evidence to survive summary judgment on her RICRA claim against Striuli. Whether Striuli will be held liable on that theory depends upon a factual determination inappropriate for disposal as a matter of law. Liu has presented some evidence that Striuli interfered with her relationship as a student with the College. This Court has previously recognized that a student's relationship with an institution of higher education is contractual in nature. *See Russell v. Salve Regina College,* 649 F.Supp. 391, 405 (D.R.I.1986). According to Liu, Striuli threatened to take action which would terminate her visa status and thereby end her pursuit of a doctorate degree at the College. She has further alleged in her evidentiary submissions that as a result of Striuli's abuse, her academic performance suffered materially. Whether Striuli interfered with Liu's relationship with the College in a manner prohibited by RICRA turns on the resolution of several facts that are in dispute. Therefore, Striuli's Motion for Summary Judgment as to Count III is denied.

### 5. COUNT IV: RHODE ISLAND PRIVACY ACT

Striuli next challenges Liu's cause of action based on the Rhode Island Privacy Act, R.I.Gen.Laws § 9–1–28.1, ("Privacy Act"). His arguments are to no avail. In support of his motion as to this count, Striuli does little more than dispute the facts of his relationship with Liu.

■ Rhode Island has never recognized a common law right to privacy. *See Pontbriand v. Sundlun,* 699 A.2d 856, 863 (R.I. 1997); *Henry v. Cherry & Webb,* 30 R.I. 13, 73 A. 97, 99 (R.I.1909); *see also Mendonsa v. Time Inc.,* 678 F.Supp. 967, 968–70 (D.R.I. 1988) (reviewing the history of the right to privacy generally and in Rhode Island specifically). However, the Rhode Island General Assembly created a universe of statutory privacy rights in 1980. *See* 1980 R.I.Pub. Laws ch. 403, § 1, codified at R.I.Gen.Laws § 9–1–28.1. The Privacy Act adopted the formulation of four common law privacy torts outlined in the *Restatement (Second) of Torts.* *Compare* R.I.Gen.Laws § 9–1–28.1 *with Restatement (Second) of Torts* § 652A (1977). Protected by the statute are the rights to be secure from (1) "unreasonable intrusion upon one's physical solitude or seclusion;" (2) "an appropriation of one's name or likeness;" (3) "unreasonable publicity given to one's private life;" and (4) "publicity that reasonably places another in a false light before the public." R.I.Gen.Laws § 9–1–28.1(a). In order to guarantee these rights, the Privacy Act creates an express private right of action at law or in equity to redress violations of the statute. *See id.* § 9–1–28.1(b).

■ Only the first of the privacy torts created by the statute is at issue here. Liu claims that Striuli violated her "right to be secure from unreasonable intrusion upon one's physical solitude or seclusion." *Id.* § 9–1–28.1(a)(1). In order to establish a cause of action under that provision, Liu must demonstrate that Striuli's intrusion "was an invasion of something that is entitled to be private or would be expected to be private" and that "[t]he invasion was or is offensive or objectionable to a reasonable man." *Id.* The statute further provides that "[t]he person who discloses the information need not benefit from the disclosure." *Id.*

■ Liu has produced some evidence that could satisfy both prongs of the statutory test. According to her version of the facts, Striuli burst into her apartment and raped her. This may qualify as an "invasion of something that is entitled to be private or would be expected to be private." *See id.* § 9–1–28.1(a)(1)(A). In fact, as a matter of basic human decency, it is difficult to imagine something more deserving of the right to privacy than one's own body. *See Russell,* 649 F.Supp. at 404 (holding that for purposes of R.I.Gen.Laws § 9–1–28.1(a)(1), "few things are more personal or private" than one's body). If Liu's version of the facts is accurate, there can be little doubt that the invasion, i.e., the rape, was "offensive or objectionable to a reasonable man." R.I.Gen. Laws § 9–1–28.1(a)(1)(B). Finally, Liu alleges that Striuli disclosed to a third party, D'Arcy, without her consent, details about her sexual relationship with Striuli. Each of these allegations is supported by Liu's own

deposition evidence and the nature and meaning of each is contested by Striuli. This factual dispute must be resolved by a jury. Striuli's Motion for Summary Judgment as to Count IV is denied.

### 6. COUNT VII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

There is no basis in law for Liu's cause of action for negligent infliction of emotional distress against Striuli. Liu cannot maintain a cause of action based in negligence when the theory of her case and the entirety of the facts that she has marshaled in her support lead to the conclusion that if Liu is correct, Striuli committed intentional acts.

■ The distinction between negligent and intentional acts is an important one, for courts have recognized that "intentional conduct cannot be negligent conduct and that negligent conduct cannot be intentional conduct." *Waters v. Blackshear*, 412 Mass. 589, 591 N.E.2d 184, 185 (Mass.1992); *see Haines v. Fisher*, 82 F.3d 1503, 1510 (10th Cir.1996) (applying Wyoming law) (upholding trial court's refusal to instruct a jury on a negligence cause of action because the defendant's acts were intentional); *Landry v. Leonard*, 720 A.2d 907 (Me.1998) ("When there is substantial certainty that injury will result from an act or when there is a deliberate act to cause the injury, that act is not a negligent act. It is an intentional act.").

The distinction between these two forms of tortious conduct has been helpfully explained by Professor Keeton:

> In negligence, the actor does not desire to bring about the consequences which follow, nor does he know that they are substantially certain to occur, or believe that they will.... As the probability of injury to another, apparent from the facts within the acting party's knowledge, becomes greater, his conduct takes on more of the attributes of intent, until it approaches and finally becomes indistinguishable from that substantial certainty of harm that underlies intent.

Keeton et al., *supra*, § 31, at 169–70.

The consistent theme of Liu's version of the facts of this case is one of deliberate abuse and harassment by Striuli. Interpreting the evidence in the light most favorable to Liu, a reasonable jury could only find that Striuli was "substantially certain" that the complained of conduct would result in harm to Liu. Liu alleges that Striuli raped her repeatedly, threatened her with deportation, and verbally harassed her on the telephone and in person. Liu does not maintain that these acts were accidental; to the contrary, she argues that Striuli's actions were part of a calculated scheme to harass and abuse her. Liu has failed to identify any negligent acts by Striuli that have caused her harm. Liu has asserted other causes of action that may properly encompass the alleged intentional acts by Striuli. Negligence is not the proper vehicle for prosecution of those charges.

■ There is a second rationale for granting Striuli's Motion for Summary Judgment as to Count VII of the Amended Complaint. The Rhode Island Supreme Court has limited the reach of the tort of negligent infliction of emotional distress to cases of bystander liability. Bystander liability applies when the plaintiff has suffered emotional harm as a consequence of witnessing the defendant's wrongful infliction of injury upon a close relative of the plaintiff. *See Marchetti v. Parsons*, 638 A.2d 1047, 1052 (R.I.1994). In *Marchetti*, the Rhode Island Supreme Court enumerated the necessary elements of a negligent infliction of emotional distress cause of action: the plaintiff must demonstrate that she (1) is a close relative of the person injured by the defendant; (2) was present at the scene of the injury and was aware of the injury when it occurred; and that (3) she suffered "serious emotional injury that is accompanied by physical symptomatology" as a result of witnessing the incident. *Id.* at 1052.

■ Application of this cause of action to the facts of Liu's complaint is impossible. Liu was not a bystander who was harmed as a result of Striuli's infliction of harm upon some third party. Rather, Liu alleges that her injuries are the direct result of Striuli's physical and mental abuse of her. *See Iacampo*, 929 F.Supp. at 581 (holding that a cause of action for negligent infliction of emotional distress under Rhode Island law is

viable only where the plaintiff is a bystander to defendant's wrongful injury of a third party). For both of the reasons discussed above, Striuli's Motion for Summary Judgment as to Count VII is granted.

### CONCLUSION

For the forgoing reasons, Striuli's Motion for Summary Judgment as to Counts I and VII is granted. Striuli's Motion for Summary Judgment as to all counts on the basis of res judicata is denied. Striuli's Motion for Summary Judgment as to Counts II, III, and IV is denied. Providence College's Motion for Summary Judgment as to Counts I, III, VII, and VIII is granted. Plaintiff's claims against defendant Striuli contained in Counts II (VAWA), III (RICRA), IV (Privacy Act), V (assault and battery), and VI (intentional infliction of emotional distress) will be scheduled for trial. No judgments will enter until all claims are finally resolved.

It is so ordered.