Holland v. Chubb Am. Serv. Corp.     CV-95-201-SD  08/21/96 P
                    UNITED STATES DISTRICT COURT FOR THE

                         DISTRICT OF NEW HAMPSHIRE


Jay Holland


     v.                                      Civil No. 95-201-SD


Chubb America Service Corporation



                              O R D E R

     In this civil action, plaintiff Jay Holland alleges, inter
alia, a claim for unlawful discrimination in violation of the
Americans with Disabilities Act of 1990 (ADA), Pub. L. No. 101-
336, 104 Stat. 327 (codified at 42 U.S.C. § 12101, et seq.
(1995)), against defendant Chubb America Service Corporation.
Due to the federal question raised in plaintiff's complaint,
Chubb removed the action to this court from the Strafford County
(New Hampshire) Superior Court.

     Presently before the court is defendant's motion for summary
judgment, to which plaintiff objects.  Both parties have filed
reply memoranda.



                            Background

     Jay Holland began his employment with Chubb America Service

Corporation on or about January 4, 1988.  He was employed by Chubb as a senior analyst programmer at Chubb's Concord, New Hampshire, facility.  Some six years later, Holland's employment with Chubb was terminated on March 31, 1994.

Holland asserts that he requested a work schedule modification in early 1993 to accommodate a panic disorder that he had developed.  This modification would have shifted Holland from Chubb's "flextime" schedule, which permitted employees to work either the 7:30 a.m. to 3:30 p.m. shift, the 8:00 a.m. to 4:00 p.m. shift, or the 8:30 a.m. to 4:30 p.m. shift, to a 6:30 a.m. to 2:30 p.m. shift of his own design.  Holland's request was granted, albeit with certain performance qualifications and temporal limitations.  When the time event arrived, Holland's special schedule was continued, again with performance qualifications.

At a March 29, 1994, meeting between Holland and his immediate supervisor, Michael Williams, Holland was notified that he was to resume working within the "core hours" of Chubb's flextime schedule, e.g., the block of time between 9:00 a.m. and 3:00 p.m., within thirty days.  Holland's termination followed two days later, on March 31, 1994.

2

<u>Discussion</u>

<u>1.  Summary Judgment Standard</u>

The entry of summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.  Thus, the role of summary judgment among the array of pretrial devices is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." <u>Wynne v. Tufts Univ. Sch. of Med.</u>, 976 F.2d 791, 794 (1st Cir. 1992), <u>cert. denied</u>, 507 U.S. 1030 (1993).

Among the guidelines to be followed by the court in assaying the summary judgment record is "to interpret the record in the light most hospitable to the nonmoving party, reconciling all competing inferences in that party's favor." <u>McIntosh v. Antonino</u>, 71 F.3d 29, 33 (1st Cir. 1995) (citation omitted). "Nonetheless, a party contesting summary judgment must offer the court more than posturing and conclusory rhetoric." <u>Id.</u> (citations omitted).

"Moreover, summary judgment may be appropriate '[e]ven in cases where elusive concepts such as motive or intent are at

3

issue, . . . if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

### 2. ADA Title III Claim (Count II)

Defendant has moved for summary judgment on Holland's claim for relief under Title III of the ADA, maintaining that such title is inapplicable to employment situations. Plaintiff concedes the point, and summary judgment is accordingly granted as to Count II.

### 3. New Hampshire "Law Against Discrimination"

Count III of plaintiff's complaint purports to assert a claim for relief under New Hampshire Revised Statutes Annotated (RSA) 354-A. "As this court has had occasion to make clear in its prior rulings, RSA 354-A establishes an administrative process as a precursor to judicial review. It does not create a private right of action for individuals aggrieved by unlawful discriminatory factors." Evans v. Work Opportunities Unlimited, Inc., 927 F. Supp. 554, 556 (D.N.H. 1996) (citing Tsetseranos v. Tech Prototype, Inc., 893 F. Supp. 109, 119-20 (D.N.H. 1995);

4

Doukas v. Metropolitan Life Ins. Co., 882 F. Supp. 1197, 1200-01 (D.N.H. 1995)). Accordingly, defendant's motion for summary judgment must be and herewith is granted as to Count III.

4. Emotional Distress Claims

Plaintiff asserts claims for intentional (Count IV) and negligent (Count V) infliction of emotional distress.

RSA 281:12, the "exclusivity" provision of New Hampshire's Worker's Compensation Law, "'clearly prohibits an employee from maintaining a common-law action against his employer for personal injuries arising out of the employment relationship.'" Miller v. CBC Cos., Inc., 908 F. Supp. 1054, 1068 (D.N.H. 1995) (quoting O'Keefe v. Associated Grocers of New England, Inc., 120 N.H. 834, 835-36, 424 A.2d 199, 201 (1980)). This provision has been interpreted to bar emotional distress claims irrespective of whether they charge the employer with intentional or negligent conduct, because "[e]motional distress is a personal injury, not subject to recovery in a common law action under [the] state workmen's compensation statute." Censullo v. Brenka Video, Inc., 989 F.2d 40, 43 (1st Cir. 1993) (citing Bourque v. Town of Bow, 736 F. Supp. 398, 404 (D.N.H. 1990)).

"Although the relationship between employer and employee is severed upon an employee's termination, the harms of emotional

5

distress . . . which may spring from such termination clearly arise out of 'the course of employment'--a phrase which necessarily contemplates and includes an employee's termination." Kopf v. Chloride Power Elecs., Inc., 882 F. Supp. 1183, 1191 (D.N.H. 1995). Accordingly, the court herewith grants defendant's motion for summary judgment as to Counts IV and V.

5. Breach of Contract

In Count VI of the complaint, Holland asserts a claim for breach of employment contract. The contours of such claim, as originally asserted, were as follows:

> 74. Defendant's written employee handbook, and defendant's conduct relative to this employee and other employees established a contract of employment, a part of which contract included the right and opportunity for employees to work a modified work schedule[].
> 75. Plaintiff relied upon said contract term permitting flexible work hours.
> 76. Plaintiff further relied on the contract terms established in the employee handbook and further established through the defendant's conduct relative to disciplinary proceedings and requirements prior to termination of employees.
> 77. Defendant breached said contract by, among other things, failing to follow its established procedures prior to terminating an employee, and failing to allow an employee, Jay Holland, to work flexible hours as set forth in its written policies and procedures.[1]

---

[1]This argument--that the employer breached a contract of employment by failing to follow its termination procedures--has

6

Complaint ¶¶ 74-77.  Characterizing the employment relationship between Chubb and Holland as one of employment-at-will, defendant counter asserts that there was no employment contract in existence that could be breached and thus Holland's claim fails as a matter of law.

In response to Chubb's summary judgment campaign, Holland now submits "that the employment-at-will statement relied upon by Chubb and contained within the Chubb handbook was not in his employee handbook when he joined the company," Plaintiff's Objection at 13-14, and thus the handbook language does not describe the parameters of Holland's relationship with Chubb and vice versa.  Rather, as a result of certain pre-hire conversations between Holland, Chubb representatives, and the professional recruiters who put the parties together,

> Holland contends that there was a valid employment
> contract the terms of which entitled him to a job

---

been previously rejected by both this court and the New Hampshire Supreme Court.  See Kern v. Kollsman, 885 F. Supp. 335, 349 (D.N.H. 1995) ("Although the Butler court indicated that a 'plaintiff well might make a case asserting damages from failure to follow the step discipline procedure as a contractual incident of employment, unrelated to any durational claim . . . [t]he ultimate act of termination would be a thin reed for such a case . . . .'" (quoting Butler v. Walker Power, Inc., 137 N.H. 432, 437, 629 A.2d 91, 94 (1993)); see also Burr v. Melville Corp., 868 F. Supp. 359, 365 (D. Me. 1994) ("even if Defendants had failed to follow the procedures outlined in the personnel policy, such failure cannot constitute a 'breach of implied contract'") (interpreting New Hampshire law).

as long as he did the job using his technical skills. Chubb may have attempted to modify this contract when it created the employee handbook; however, it created the handbook which it now relies upon well after Jay Holland started working at Chubb. Plaintiff specifically rejected the attempted modification when he refused to sign the acknowledgment form.

Id. at 16 (citation omitted).

Taking the parties' positioning at face value, it is important, in aid of ultimate resolution, to identify what is truly in contention. Plaintiff now makes no attempt to argue that subsequent modifications to his employment arrangement transformed same from at-will to tenured status. See Plaintiff's Reply at 6 ("It is plaintiff's position that the contract was formed at the date of hiring, and that there was no subsequent modification of the contract changing the original terms. Plaintiff admits that defendant attempted to modify the contract, but that such modification was specifically rejected by the plaintiff . . . ."). Thus, irrespective of the employee handbook language, and notwithstanding which version of Chubb's employee handbook is deemed to apply, Holland's position is that "the issue of whether he would have a job so long as he performed the technical aspects of the job, was discussed and negotiated, and that this term of his employment contract was reaffirmed on more than one occasion after his hiring." Id. Summary judgment is

8

thus forestalled, for the present, because a genuine issue allegedly remains over whether defendant breached its contract with Holland: "a contract of employment lasting for the work life of the plaintiff, so long as [he] performed the technical aspects of the job." Id. at 7.

Under the law of this state, "the at-will status of an employment relationship is 'one of prima facie construction.'" Smith v. F.W. Morse & Co., 76 F.3d 413, 426 (1st Cir. 1996) (quoting Panto v. Moore Business Forms, Inc., 130 N.H. 730, 739, 547 A.2d 260, 267 (1988)). "That is to say, unless an employment relationship explicitly provides for a definite duration, it is presumed to be at-will." Id. (citing Butler, supra note 1, 137 N.H. at 435, 629 A.2d at 93) (emphasis added). Thus, "when an employee challenges [his] ouster . . . unless a statute, a collective bargaining agreement, or some aspect of public policy proscribes firing the employee on a particular basis," id., the employer can give such employee his "walking papers at any time, for any reason or no reason," id.

Moreover, despite the fact that the New Hampshire Supreme Court "has not explicitly addressed the contours of contracts for lifetime employment," id. at 427, the prevailing view, and the one the court would adopt, "regards such contracts as out of the ordinary, and insists that an offer of lifetime employment must

9

be *expressed in clear and unequivocal terms* to be enforceable," *id.* (emphasis added) (collecting cases).

When compared to this yardstick, the comments allegedly made to Holland--"that I could be [at Chubb] as long as I wanted to," Holland Deposition, vol. I, at 173 (attached to Plaintiff's Objection as Exhibit D); "I was looking for a place to retire and . . . [was told] that Chubb was the place that I could do it at," *id.* at 174--whether by Chubb or others, "do not stand sufficiently tall to confer lifetime employment," *Smith, supra,* 76 F.3d at 427 (citing, inter alia, *Skagerberg v. Blandin Paper Co.,* 266 N.W. 872, 874 (1936) (finding that the terms "permanent employment," "life employment," and "as long as the employee chooses" established only an at-will contract)).

Accordingly, summary judgment must be and herewith is granted as to Count VI.


6.  ADA Claim

Claims for relief founded upon the ADA, as with the federal anti-discrimination statutes generally, are evaluated by the court under the familiar and well-established burden-shifting framework first enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *See Nedder v. Rivier College,* 908 F. Supp. 66, 73 (D.N.H. 1995).  Under this paradigm, the first inquiry is

whether plaintiff has established a prima facie case of discrimination, <u>Udo v. Tomes</u>, 54 F.3d 9, 12 (1st Cir. 1995). The burden of proving each element thereof rests squarely with Holland. <u>See</u> <u>Cook v. Department of Mental Health, Retardation, and Hosps.</u>, 10 F.3d 17, 22 (1st Cir. 1993).

"The Americans with Disabilities Act is a federal civil rights statute, enacted 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" <u>Katz v. City Metal Co.</u>, 87 F.3d 26, 30 (1st Cir. 1996) (quoting 42 U.S.C. § 12101(b)(1)).

> To obtain relief under the Act, a plaintiff must prove three things. First, that he was disabled within the meaning of the Act. Second, that with or without reasonable accommodation he was able to perform the essential functions of his job. And third, that the employer discharged him in whole or in part because of this disability.

<u>Id.</u> (footnote omitted).

Under the ADA,

> The term "disability" means with respect to an individual--
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). A "physical impairment" is "[a]ny mental or psychological disorder, such as . . . emotional or mental illness . . . ." 29 C.F.R. § 1630.2(h)(2) (1995). "Major life

11

activities" are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).

"Substantially limited" is defined as:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  Whether an individual is substantially limited in a major life activity depends upon a multi-factor assessment, including,

> (i) The nature and severity of the impairment;
> (ii) The duration or expected duration of the impairment; and
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).  "'Some conditions may be long-term or potentially long-term, in that their duration is indefinite and unknowable or is expected to be at least several months.  Such conditions, if severe, may constitute disabilities.'"  Katz, supra, 87 F.3d at 31 (quoting 2 EEOC COMPLIANCE MANUAL, INTERPRETATIONS (CCH) § 902.4, ¶ 6884, p. 5319 (1995)).

[W]hether an impairment substantially limits a

12

> major activity must be made on an individual
> basis:
>> The determination of whether an
>> individual has a disability is . . .
>> based . . . on the effect of that
>> impairment on the life of the individual.
>> Some impairments may be disabling for
>> particular individuals but not for
>> others.

Id. at 32 (quoting 29 C.F.R. pt. 1630, App. at 402) (other citation omitted).

For the purposes of the instant motion, Chubb concedes that Holland's "panic disorder" qualifies as an ADA impairment.[2] Its chief argument, rather, is that plaintiff's alleged impairment is not "substantially limiting" as required for relief under the ADA. Although some evidence exists, albeit self-serving, that Holland's condition substantially limits a major life activity other than working, the court assumes arguendo, as part of its analysis of the motion sub judice, that plaintiff is not substantially limited in a major life activity other than working. Accordingly, the analysis now turns to whether Holland is substantially limited in his ability to work. See, e.g., id. at 31 n.3 ("if an individual is substantially limited in a major life activity other than working, or is so regarded, 'no

---

[2]Although Chubb actually concedes "disability", its argument evinces the erroneous nature of their concession, and the court construes their concession to be a more limited acknowledgment that Holland's panic disorder qualifies as an ADA "impairment".

13

determination should be made as to whether the individual is substantially limited in working.'" (quoting 29 C.F.R. pt. 1630, app. at 403)).

To be considered substantially limited in the major life activity of working, an ADA plaintiff must present evidence of being "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). However, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Id. Supplementing the factors listed in 29 C.F.R. § 1630(j)(2), the following

> may be considered in determining whether an individual is substantially limited in the major life activity of "working":
>   (A) The geographical area to which the individual has reasonable access;
>   (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
>   (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various

14

classes).

29 C.F.R. § 1630.2(j)(3)(ii).

Holland was, at the time of his termination, seeing both a cardiologist and a psychologist for treatment of his panic disorder. Specific symptoms of such ailment included "chest pain, sweating, neck pain, agitation, and fears of fainting and/or having a heart attack." July 20, 1994, Letter of Eric R. Niler, Ph.D. (attached to Plaintiff's Objection as Exhibit C).

Per the cardiologist's direction, Holland was taking the prescription antianxiety medicine Xanax. Dr. Niler opined that

> [w]hile the goal of cognitive-behavioral treatment for panic disorder involves having individuals learn to face their fears via in vivo (i.e. "real life") exposure practice, it would have been unreasonable and counterproductive for Mr. Holland to return to his previous work schedule prior to his having learned how to handle these frightening symptoms.

Id. Moreover, Dr. Niler concluded "that Mr. Holland's work restrictions with respect to his schedule were medically necessary . . . ." Id. at 2; see also July 26, 1993, Niler Letter ("although the goal of Mr. Holland's treatment is to eventually make him panic-free, at this time I believe that his . . . 'flex' schedule is psychologically necessary to allow him to function in his job") (attached to Plaintiff's Objection as Exhibit B).

15

Plaintiff's evidence on this sub-element of the disability prong, although a very close case, is susceptible of differing interpretations and should therefore be presented before a jury. Cf. Soileau v. Guilford, Inc., 928 F. Supp. 37, 48 (D. Me. 1996) (plaintiff's depression and concomitant "inability to interact with others at work" did not substantially limit the major life activity of working).

"The second element of proof is ability to perform the essential functions of the job with or without reasonable accommodation." Katz, supra, 87 F.3d at 33 (citing 42 U.S.C. § 12111(8)). "Reasonable accommodations include, inter alia, 'job restructuring [and] part-time or modified work schedules.'" Id. (quoting 42 U.S.C. § 12111(9)).

> "With respect to known disabilities, however, the emphasis is on encouraging the employer to 'engage in an interactive process with the individual to determine an effective reasonable accommodation.' Guidance § IV.B.6b (citing H.R. Rep. No. 485 (Pt. 2), supra, at 65-66, U.S.C.C.A.N. at 347-48."

Id. (quoting Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 677 (1st Cir. 1995)). Although Chubb is permitted to attempt to show that accommodating Holland would, or did, impose on it an "undue hardship", 42 U.S.C. § 12111(10), this second element of the ADA claim is fraught with genuine issues and thus cannot be determined by the court on summary judgment.

16

"The third element of plaintiff's case, that [Holland] was fired because of a disability, or that his disability was a motivating factor in [Chubb's] decision to fire him," Katz, supra, 87 F.3d at 33 (citing Pedigo v. P.A.M. Transp., Inc., 60 F.3d 1300, 1301 (8th Cir. 1995)), also is a question for the jury. As in Katz, the timing of Holland's firing, two days subsequent to a meeting wherein Holland was required to return to his pre-accommodation work schedule, is "circumstantial evidence from which the jury [can] find that [Holland's] disability triggered, in whole or in part, his firing by [Chubb]." Id.

"[U]nder the second step of the McDonnell Douglas outline, the burden . . . shift[s] to [Chubb] to articulate a legitimate, non-discriminatory reason for [Holland's] termination." Bunevith v. CVS/Pharmacy, 925 F. Supp. 89, 94 (D. Mass. 1996) (citing Udo, supra, 54 F.3d at 12). Chubb provides a detailed account of the last year of Holland's employment, wherein, the court so finds, numerous legitimate, nondiscriminatory reasons for the adverse employment action are asserted.

> 12. On March 10, 1993, Holland was given his 1993 review. In this review, Holland was asked to continue to improve working relations with his peers. Specifically, he was told that he sometimes lets his personal opinion of peers cloud his interaction with them. It was also mentioned that his work schedule was inflexible.
> . . . .
> 14. On or about March of 1993, I became aware

17

that Holland was keeping hours different from those outlined in the employee handbook. Specifically, Holland was coming in at 6:30 a.m. and leaving at 2:30 p.m.

. . . .

18. I allowed Holland to continue his flexible hours. I told him I would monitor the situation and that he could work early hours as long as he could still communicate effectively with Team members.

19. I became aware that other employees were commenting that he was difficult to reach. It was difficult for Holland's peers to schedule times when Holland could be part of a discussion.

. . . .

22. On February 16, 1994, a production problem occurred and remained unresolved for almost two weeks. It was finally resolved on February 28, 1994. It was Holland's job to coordinate the resolution of this problem.

23. During this two week period, I learned that Holland's hours were becoming irregular. He no longer came to work predictably at 6:30 a.m. but arrived and departed work at different times each day. This was not something that I had agreed to and is specifically disapproved in the employee handbook.

. . . .

29. On March 29, 1994, I met with Holland for a formal documentation meeting. A formal documentation meeting is used to provide a written documentation of an employee's performance problems and as a final warning prior to termination of the employee.

. . . .

38. I terminated Holland's employment with Chubb on March 31, 1994.

39. Holland was fired because he was rude and disrespectful. He consistently refused to acknowledge that his supervisors might have valid criticism. After the documentation meeting, it was apparent to me that Holland was not going to change. Holland was inflexible in his opinion that he was right and any criticism of his behavior was wrong. The meeting was further and

18

> final proof of his insubordinate attitude and absolute unwillingness to listen or change. Knowing this, I felt that further conversation with Holland would be unproductive. I felt that it was impossible to allow him to continue his employment at Chubb.

Affidavit of Michael Williams at pp. 3-9 (attached to Defendant's Motion as Exhibit 6).

Chubb has, in view of the foregoing assertions, sustained its burden at McDonnell Douglas stage two.

Once a case moves successfully beyond stages one and two, the final step of the McDonnell Douglas framework requires Holland to introduce evidence sufficient to support findings that "would allow a jury to find that [Chubb's] articulated reason for his termination was a pretext for discrimination based upon his claimed disability." Bunevith, supra, 925 F. Supp. at 94.

There is a bounty of memoranda, e-mails, letters, and performance reviews before the court, all submitted by the parties in aid of establishing the summary judgment record. See, e.g. May 5, 1993, Informal 11 Month Performance Appraisal of Jay Holland (attached to Plaintiff's Objection as Exhibit F); February 15, 1994, e-mail from Jay Holland to George Hill (attached to Defendant's Motion as Exhibit 3); February 24, 1994, e-mail from Jay Holland to Michael Williams (attached to Defendant's Motion as Exhibit 4); March 24, 1994, Memorandum from

Michael Williams to Jay Holland (attached to Plaintiff's Objection as Exhibit G). Such record is supplemented by the deposition excerpts of both Holland and Michael Williams, as well as the Williams affidavit.

This record, taken in sum, lays bare the competing allegations strenuously asserted on each party's behalf. When viewed, as the summary judgment record must be, in the light most favorable to Holland, the nonmovant, the court cannot say that he has not presented evidence that would enable a rational jury to find that his termination for work-related issues was merely a pretext for discrimination based on his alleged disability or for Chubb's unwillingness to effectively accommodate same. Plaintiff's alleged attitude incompatibility may indeed be related to his claimed disability, but Chubb would be well within its rights to cashier plaintiff for the former so long as such action does not serve as a veil for the latter. On this record, however, the court cannot parse the permissible from the impermissible.

In light of the jury questions raised at each of the three elements required to prove Holland's ADA prima facie case, as well as the genuine issues raised in Holland's rebuttal of Chubb's legitimate reason for his termination, defendant's motion for summary judgment as to Count I must be and herewith is

20

denied.

Conclusion

For the reasons set forth herein, defendant's motion for summary judgment (document 8) is granted as to Counts II, III, IV, V, and VI, and denied as to Count I.  Trial will go forward on plaintiff's ADA claim, with such trial currently calendared to commence during the two-week period beginning on January 27, 1997.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

August 21, 1996

cc:  Christine M. Rockefeller, Esq.
     Debra Weiss Ford, Esq.