Elmasry v. Veith, et al.                    CV-98-696-JD  01/07/00 P
                     UNITED STATES DISTRICT COURT FOR THE
                           DISTRICT OF NEW HAMPSHIRE


Jennifer Elmasry

       v.                                    Civil No. 98-696-JD
                                             Opinion No. 2000 DNH 005
Bill Veith and M & E
Manufacturing Company,
a division of Plastek Industries


                              O R D E R


       Jennifer Elmasry has brought suit against her former

employer, M & E Manufacturing Company, and her former supervisor

at M & E, Bill Veith, claiming sexual harassment and intentional

and negligent infliction of emotional distress.  The defendants

move for summary judgment (document no. 18), and Elmasry

objects.[1]

_____

       [1]The defendants note that Elmasry's complaint does not
specify against which defendant(s) each claim is brought.
Assuming she brings all of her claims against both Veith and M &
E, the court grants summary judgment in M & E's favor on the
claims of intentional and negligent emotional distress because
these claims are barred against M & E by New Hampshire's workers'
compensation statute.  See N.H. Rev. St. Ann. § ("RSA") 281-A:8;
Holland v. Chubb Am. Serv. Corp., 944 F. Supp. 103, 105 (D.N.H.
1996) (negligent infliction of emotional distress barred); Young
v. Conductron Corp., 899 F. Supp. 39, 41 (D.N.H. 1995)
(intentional infliction of emotional distress barred).
       The court grants summary judgment in Veith's favor on the
claim of sexual harassment because this district does not
recognize individual liability under Title VII.  See Preyer v.
Dartmouth College, 968 F. Supp. 20, 24 (D.N.H. 1997); Miller v.
CBC Cos., 908 F. Supp. 1054, 1064-65 (D.N.H. 1995).

## Standard of Review

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "An issue is only 'genuine' if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor . . . while a fact is only 'material' if it has 'the potential to affect the outcome of the suit under the applicable law.'" Bourque v. FDIC, 42 F.3d 704, 708 (1st Cir. 1994) (citations omitted). In response to a properly supported motion for summary judgment, the nonmoving party bears the burden to show a genuine issue for trial by presenting significant material evidence in support of the claim. See Tardie v. Rehabilitation Hosp., 168 F.3d 538, 541 (1st Cir. 1999). The record evidence is taken in the light most favorable to the nonmoving party. See Zambrana-Marrero v. Suarez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999). Summary judgment will not be granted as long as a reasonable jury could return a verdict in favor of the nonmoving

2

party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Background

Jennifer Elmasry began working for M & E on November 19, 1997.  Elmasry was hired to work as an inspector/packer in M & E's manufacturing plant, located in Laconia, New Hampshire.  M & E is a division of Plastek Industries, located in Pennsylvania.  Elmasry worked at M & E until March of 1998.

Bill Veith was the general manager of M & E's plant.  Veith had the authority to hire and fire plant employees, and he hired Elmasry.  Elmasry claims that soon after she began working at M & E, Veith began commenting regularly on her appearance.  In her affidavit and deposition, Elmasry reports that Veith made comments about how attractive she was, and talked with her more than with other employees.  When Elmasry had to miss work for medical reasons, Veith came to her home and took her out to lunch with her family.  Elmasry says this made her uncomfortable because she thought it was strange, although Veith was friendly with her family members, who also worked at M & E.

After working at M & E approximately three months, Elmasry accepted a transfer to work in the plant office because her doctor recommended that she work light duty.  She worked in the office approximately one month until her employment terminated.

3

Elmasry accepted the transfer knowing that she would be working closely with Veith in the office. It appears from the record that most of the conduct Elmasry complains of occurred after she was transferred to the office. She says Veith made comments to her about her looks, the size of her breasts, and that he would like to see "her ass in a bikini." Veith often brought her into his office and closed the door. Elmasry told him this made her uncomfortable, but he continued this behavior. Elmasry says that she repeatedly told Veith his behavior was inappropriate because he had a girlfriend, she had a boyfriend, and he was her boss. Veith denies making sexual comments to Elmasry.

Elmasry says Veith took her out a number of times for meals, always paying for her. She states that Veith gave her money outright from M & E's petty cash to pay for her bills and a speeding ticket, and that he made sure she was paid for time she did not work, in violation of company rules. Once, she says, he gave her money and then hugged her, claiming he deserved it for taking care of her. On one occasion Elmasry paid Veith back for money he gave her, but otherwise she did not pay him back. Elmasry says she did not want to accept these favors but felt that she had to because Veith was her boss. She says she believed that Veith wanted some sort of sexual relationship with her in return for the favorable treatment he gave her. Veith

4

acknowledges lending her money on two occasions and taking her out for meals and says that he did similar things for other employees.

Elmasry states that on one occasion, Veith's supervisor from Plastek in Pennsylvania visited M & E and Veith instructed Elmasry beforehand to wear her hair down, a nice dress and high heeled shoes on the day his boss was coming. He warned Elmasry that when his boss saw her breasts, he might try to take her away from Veith. When the supervisor, Nar Handa, arrived, he commented to Elmasry about her appearance and said something to her about being able to go anywhere with him on his plane.

On another occasion, several employees from Plastek were visiting from Pennsylvania. Veith asked Elmasry to meet them at a restaurant after work. Elmasry claims Veith led her to believe that other female employees from the office would be there. However, when she arrived she was the only woman. She says the men from Pennsylvania and Veith made numerous sexual comments about women at M & E, including a wager as to whether Veith would sleep with a particular woman. Elmasry says that at the restaurant, Veith came up to her, touched his leg against hers and told her how much he liked her. When she left the restaurant, Veith went with her to her car, where he asked to kiss her. Elmasry declined, and Veith said something about not

5

wanting to end up in court. Veith claims that other women were invited to the dinner, and denies making any advances to Elmasry that night.

Elmasry states that she stopped going to work in March after Veith told her he wanted to take her out for her birthday and said that he had something special for her. She claims she stopped going to work because she was afraid of Veith and because she was embarrassed that other people thought she was involved with him. She went to the police to complain about Veith's behavior, and the police told her not to return to work. Shortly thereafter, Veith sent Elmasry a letter notifying her that because she had missed two consecutive days of work without notice, her employment was terminated. Elmasry never complained to anyone at M & E or Plastek about Veith's behavior, except to Veith himself.

When Elmasry was hired, she received a Plastek employee handbook which explained the company's anti-harassment policy and complaint procedure. The handbook also contained a more generic problem solving procedure. The procedures instructed employees to report to a manager or human resources personnel. In addition, Elmasry received an overview of the company's procedures and policies. Elmasry says that no one ever specifically informed her about an anti-harassment policy, nor

did anyone tell her to whom she should complain if she experienced harassment. She says she was unaware of anyone at M & E who handled human resources. She skimmed the handbook once and did not notice the anti-harassment section, but that even if she had, she would not have complained to anyone at M & E because she did not feel comfortable going to anyone there.

## Discussion

M & E claims that because no tangible employment action was taken against Elmasry, M & E can avail itself of the affirmative defense provided in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998). M & E argues that it meets the first prong of this defense because it had a company policy against sexual harassment in place when Elmasry worked there, it instituted a procedure for employee complaints, and it made Elmasry aware of this policy and procedure. M & E argues that it meets the second prong of the affirmative defense because Elmasry unreasonably failed to utilize M & E's complaint procedure. M & E also contends that the conduct about which Elmasry complains is not actionable under the legal standard for a hostile work environment.

Veith argues that Elmasry's claim of negligent infliction of emotional distress fails because it is inconsistent with her

7

claims that Veith acted intentionally. He asserts that he should prevail on the claim of intentional infliction of emotional distress because his behavior was not sufficiently extreme or outrageous. The court addresses these arguments below.

A. Sexual Harassment

1. Tangible Employment Action

Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a). Sexual harassment constitutes unlawful discrimination on the basis of sex under Title VII. See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66 (1986); Provencher v. CVS Pharmacy, 145 F.3d 5, 13 (1st Cir. 1998).

Sexual harassment in the workplace has traditionally been analyzed under one of two rubrics, quid pro quo harassment or hostile work environment. See Wills v. Brown University, 184 F.3d 20, 25 (1st Cir. 1999). The Supreme Court altered this framework somewhat with its recent opinions in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998). The Court characterized

8

quid pro quo as harassment that results in a tangible employment action, and hostile work environment as harassment that precedes, or does not result in, a tangible employment action. See Burlington, 524 U.S. at 754. If the harassment does not result in a tangible employment action, the employer may raise an affirmative defense to vicarious liability or damages. See Burlington, 524 U.S. at 765. This defense ("the Burlington defense") "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 765. If a supervisor's sexual harassment results in a tangible employment action against an employee, the employer may not raise the Burlington defense to vicarious liability. See id. Therefore, the court begins by determining whether Elmasry suffered a tangible employment action.

M & E claims that there was no tangible employment action because Elmasry voluntarily quit her job. Elmasry argues that she was constructively discharged and thereby experienced a tangible employment action, or in the alternative, that Veith fired her for discriminatory reasons.

9

a. Constructive Discharge

The Supreme Court in Burlington defined a tangible employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington, 524 U.S. at 761. "Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act." Id. at 762.

In Burlington the plaintiff, Ellerth, did not complain to her employer about her supervisor's harassing behavior, resigned from her job, and claimed that she was constructively discharged. See id. at 749. The Court found that since Ellerth's claim "should be categorized as a hostile work environment claim" because it involved "only unfulfilled threats," no tangible employment action had been taken. Id. at 754. It appears from the opinion that the Court did not consider Ellerth's claim of constructive discharge to allege a tangible employment action. See id. at 766.

Subsequent to the decision in Burlington, various lower courts have issued disparate holdings that constructive discharge is always, never, or sometimes a tangible employment action.

10

Some courts have concluded from Burlington that constructive discharge cannot be a tangible employment action for the purpose of barring the use of the Burlington defense. See Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 294-95 (2d Cir. 1999) (holding constructive discharge not a tangible employment action under Burlington); Powell v. Morris, 37 F. Supp. 2d 1011, 1019 (S.D. Ohio 1999) (holding tangible employment actions limited to specific actions listed in Burlington's definition, which does not include constructive discharge); Desmarteau v. City of Wichita, Kan., 64 F. Supp. 2d 1067, 1079 (D. Kan. 1999) (holding constructive discharge not a tangible employment action under Burlington); Alberter v. McDonald's Corp., __ F. Supp. 2d __, 1999 WL 970298, at *9 (D. Nev. Sept. 20, 1999) (same); Scott v. Ameritex Yarn, __ F. Supp. 2d __, 1999 WL 1054900, at *5-7 (D.S.C. Nov. 19, 1999) (same). However, other courts have held that constructive discharge can be a tangible employment action.[2] See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 n.5 (3d Cir. 1999) (recognizing constructive discharge as tangible employment action barring Burlington defense); Galloway v. Matagorda County,

---

[2]Constructive discharge may be considered an adverse employment decision for the purpose of finding discrimination under the Rehabilitation Act, see Hurley-Bardige v. Brown, 900 F. Supp. 567, 572 (D. Mass. 1995), and the Age Discrimination in Employment Act, see Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 480 (1st Cir. 1993).

11

Tex., 35 F. Supp. 2d 952, 957 (S.D. Tex. 1999) (same); Troendle v. Yellow Freight, Inc., 1999 WL 89747, at *5 (E.D. Pa. 1999) (same).

There are some courts that seem hesitant to take a stand on the issue, while others proceed to a constructive discharge analysis without deciding whether a finding of constructive discharge would result in a tangible employment action. See Phillips v. Taco Bell Corp., 156 F.3d 884, 889 n.6 (8th Cir. 1998) (implying that constructive discharge can be tangible employment action but finding no constructive discharge occurred); Lintz v. American Gen. Fin., Inc., 50 F. Supp. 2d 1074, 1084-85 (D. Kan. 1999) (holding no constructive discharge occurred); EEOC v. Barton Protective Servs., Inc., 47 F. Supp. 2d 57, 60 (D.D.C. 1999) (limiting holding that constructive discharge is not tangible employment action to that case); Jones v. USA Petroleum Corp., 20 F. Supp. 2d 1379, 1383 (S.D. Ga. 1998) (distinguishing between "normal voluntary resignation" and constructive discharge, the latter being tangible employment action); Marsicano v. American Soc'y of Safety Eng'rs, 1998 WL 603128 (N.D. Ill. 1998) (holding no tangible employment action where plaintiff quit, but implying constructive discharge precipitated by supervisor's action could be tangible employment action).

12

Determining whether a constructive discharge can constitute a tangible employment action requires examination of the facts peculiar to each case. There are certainly circumstances under which a constructive discharge may qualify as a tangible employment action. See, e.g., Durham Life Ins. Co., 166 F.3d at 149 n.5, 153-54 (holding constructive discharge by supervisors' actions made employer automatically liable). The facts in Durham strongly suggested that the constructive discharge was "an official act of the enterprise" and therefore constituted a tangible employment action. Burlington, 524 U.S. at 762. It is conceivable that facts less egregious than those present in Durham could warrant a finding of a tangible employment action. The record presented for summary judgment in this case, however, does not support the conclusion that Elmasry experienced an official company act tantamount to a tangible employment action. Therefore the court does not consider whether Elmasry was constructively discharged because under the facts of this case, even if she were constructively discharged, that discharge does not rise to the level of a tangible employment action.[3]

_____

[3]Elmasry also argues that Veith used his authority to transfer her from the plant floor into an office position, and that this constituted a tangible employment action. On the record presented for summary judgment in this case, this conduct does not rise to the level of a tangible employment action.

b.    <u>Termination by Veith</u>

After Elmasry was absent from work for two days without notice, Veith sent her a letter in which he cited company policy that such an absence constitutes voluntary resignation.  <u>See</u> Pl. Ex. D.  The letter informed her that her "self-termination" was effective immediately.  Elmasry contends that a reasonable fact-finder could find that Veith's termination of Elmasry for unexcused absence was pretextual and he actually fired her for discriminatory reasons.  If Veith fired Elmasry because she refused to submit to his sexual demands, the firing would constitute a tangible employment action.  <u>See</u> <u>Burlington</u>, 524 U.S. at 753-54.  However, Elmasry fails to meet her burden of proof under the <u>McDonnell Douglas</u> burden-shifting framework.  <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973). The defendants have submitted sufficient evidence to rebut an inference of discrimination because Veith had a legitimate reason for terminating Elmasry, namely, her absence from work without notice.  <u>See</u> <u>Vega v. Kodak Caribbean, Ltd.</u>, 3 F.3d 476, 479 (1st Cir. 1993).  To survive summary judgment on this issue, Elmasry must present sufficient evidence that Veith terminated her for discriminatory reasons.  <u>See</u> <u>id.</u>  Elmasry has not done so.  The record shows that she failed to show for work, never gave notice that she was quitting, and told no one at M & E why she was not

14

coming in to work. This evidence is insufficient to raise a genuine question that Veith terminated Elmasry for anything other than the legitimate reasons he gave in his termination letter. See Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 182 (4th Cir. 1998) ("Tangible employment actions, if not taken for discriminatory reasons, do not vitiate the affirmative defense.").

Because there was no tangible employment action taken against Elmasry, M & E may raise the Burlington defense. See Burlington, 524 U.S. at 765. M & E claims that it is entitled to summary judgment because it prevails on both elements of this defense.

2.    First Element of Burlington Defense

To prove that it is entitled to the Burlington defense, an employer must show that it meets both elements of the defense. The first element is that "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior." Burlington, 524 U.S. at 765.

The Supreme Court held as a matter of law that the employer in Faragher did not exercise reasonable care to prevent sexual harassment when it failed to disseminate its anti-harassment policy to its supervisors, made no attempt to monitor its

15

supervisors' behavior, and did not assure employees that they could bypass their supervisors to complain about harassment. <u>See</u> <u>Faragher</u>, 524 U.S. at 808. Under these facts, reasonable care required something more than simply adopting a written anti-harassment policy. The defendant, the City of Boca Raton, could not effectively monitor all of its employees in various departments, and therefore a formal policy and "sensible" complaint procedure were necessary in that case. <u>See</u> <u>id.</u> at 808-09. However, the Court also indicated that promulgation of a policy and complaint procedure may not be required in every case, noting that "the employer of a small work force . . . might expect that sufficient care to prevent tortious behavior could be exercised informally." <u>Id.</u> at 808. Therefore, the required standard of reasonable care is fact specific and must be considered on a case-by-case basis. <u>See</u> <u>Brown v. Perry</u>, 184 F.3d 388, 396 (4th Cir. 1999) ("We recognize that an employer can meet its burden as to the first element without such a policy . . . and that mere promulgation of such a policy may well fail to satisfy the employer's burden.") (citations omitted).

Several courts have held that employers took reasonable care to prevent harassment where written anti-harassment policies and grievance procedures were distributed to employees. <u>See, e.g.</u>, <u>Montero v. AGCO Corp.</u>, 192 F.3d 856, 862 (9th Cir. 1999); <u>Shaw v.</u>

16

AutoZone, Inc., 180 F.3d 806, 811 (7th Cir. 1999); Caridad, 191 F.3d 283, 295-96. However, the facts of these cases all differ from the facts before the court. In Montero, the plaintiff received a handbook, a memorandum and two pamphlets pertaining to sexual harassment. See Montero, 192 F.3d at 862. In Shaw, the plaintiff was under a contractual obligation to read the handbook, and AutoZone "regularly conducted training sessions on sexual harassment." Shaw, 180 F.3d at 812. In Caridad, the court noted that the record indicated that the employer "endeavors to investigate and remedy problems reported by its employees." Caridad, 191 F.3d at 295. The record here is unclear as to whether M & E has adequately investigated past complaints of harassment. Furthermore, the apparent pattern of behavior on the part of upper management of M & E and Plastek is troubling. Elmasry's deposition reveals that most, if not all, of the male superiors she encountered, including individuals visiting from Plastek whom Elmasry understood to be Veith's supervisors, made comments to her of a sexual nature.[4]

_____

[4] For example, Elmasry noted the following about visitors from Plastek:
Q. And it was your conclusion that once you told Bill [Veith] you didn't like the way he was talking, and he continued to talk that way, that there was nothing else you could do? Is that what you –
A. There was no one else to turn to. Because I had already met the people from Pennsylvania, and... they

17

It is undisputed that Elmasry received a copy of the anti-harassment policy and the complaint procedure issued by Plastek, M & E's parent corporation.[5]  Elmasry argues that she was not effectively made aware of the policy, because no one specifically

were like him.
Q.  They were like him?
A.  Like comments about females.
Elmasry Dep. at 144.

[5]The policy reads as follows, from Plastek's Hourly Employee Handbook:

Plastek is committed to providing a work environment that is free of harassment.  Harassment, including sexual harassment, is prohibited and will not be tolerated whether it comes from other employees, supervisors, customers, suppliers, etc.  Sexual harassment includes (but is not limited to) unwelcome sexual advances, request for sexual favors or other undesired verbal or physical contact of a sexual nature.  Incidents of harassment include the creation of an offensive working environment that unreasonably interferes with one's work performance.
...
Any employee believed to be a victim of harassment should report the matter to their immediate supervisor or the Human Resources Department.  The issue will be kept as strictly confidential as is possible.  Violations of this policy will be subject to disciplinary action, up to and including, discharge.  Retaliation against any employee for reporting a claim of harassment or providing information during an investigation of a harassment claim also is prohibited and will result in disciplinary action.

Def. Ex. C, pp. 31-32.

18

pointed it out or explained it to her.[6]  No one at M & E told her to read the handbook, and the receipt form that Elmasry signed did not indicate that she had read or understood the book. Elmasry did not receive any additional training about sexual harassment or complaint procedures.  As far as M & E's training of management was concerned, Veith stated that he attended one training seminar, a portion of which dealt with sexual harassment.  Elmasry argues that, in a workplace like M & E where employees have limited education and awareness of such issues as sexual harassment, the mere distribution of a handbook, like the one Elmasry received, is inadequate to effectively prevent sexual harassment from taking place.  Based on the facts before the court, Elmasry has raised a genuine issue of fact as to whether M & E took reasonable care to prevent sexual harassment.

Elmasry has also raised a genuine issue of fact concerning whether M & E took reasonable care to correct illegal conduct, the other part of the Burlington defense's first element.  "[The employer] must show not only that it had a reasonable policy in

_____

[6]In her sworn deposition, Elmasry complained that the sexual harassment language in the handbook was inconspicuous, stating that the passage about sexual harassment "should be a bigger deal than just blending in with everything else.  Nothing made it stand out. . . . If it's such a big deal, it should be on the first page or make it stand out.  And it wasn't.  It looks like everything else."  Elmasry Dep. at 69-70.

19

place, but also that those employees authorized by the policy to act in response to complaints did so act when put on notice of a problem, and that their actions constituted a reasonable response under the circumstances." Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1369 n.5 (11th Cir. 1999). Elmasry told Veith directly on more than one occasion that she did not like the way he behaved towards her.[7] There is some evidence to indicate that Veith knew his behavior was inappropriate.[8] Veith, as Elmasry's

---

[7]Elmasry testified that three or four times, in response to sexual comments by Veith, she told him "to stop saying things like that because I have a boyfriend, and he had a girlfriend, and he was my boss." Elmasry Dep. at 97.

> Q. ...Now, your contention is that Mr. Veith was your
> supervisor, right?
> A. Yes.
> Q. And therefore, you didn't think you could bring
> [the harassment] to his attention?
> A. Right.
> Q. Okay.
> A. Because I had already told him.
> ...
> Q. Did you know if there were any department managers?
> A. I thought Bill was the only one.
> Q. And... you did not ask anybody about any of that
> because you hadn't read this procedure, correct?
> A. Well, I already told Bill that I didn't like the
> way he was talking.

Elmasry Dep. at 143-44.

[8]Elmasry stated in her deposition, "...and he was standing there talking to me saying that he liked me and wanted to know that if he could have a kiss. And then I told him again, no, I have a boyfriend, you have a girlfriend, you're my boss. And he said, Well, I don't want to see this ending up in court. So right then and there, I figured he knew what he was saying and

supervisor, was authorized by M & E's anti-harassment policy to act in response to complaints. A trier of fact could find that Veith was on notice of Elmasry's complaints and failed to respond reasonably. See Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 118 (3d Cir. 1999).

Finally, Elmasry argues that M & E did not take reasonable care to correct the harassment because M & E failed to conduct an internal investigation even after she quit her job, went to the police, and filed her initial complaint with the New Hampshire Commission for Human Rights. M & E takes the position that because Elmasry never informed anyone of the harassment before she quit, M & E was under no obligation to investigate what happened.

M & E's position ignores the deterrent purpose of Title VII. See Burlington, 524 U.S. at 764. The employer's remedial obligation is twofold. It must act both to end any ongoing harassment and to deter future harassment in the workplace. See Fuller v. City of Oakland, Cal., 47 F.3d 1522, 1528-29 (9th Cir. 1995), cited in Pacheco v. New Life Bakery, Inc., 187 F.3d 1055, 1061-62 (9th Cir. 1999), withdrawn after settlement, 187 F.3d 1063 (9th Cir. 1999). If the employer's remedial obligation

doing to me was wrong. And if he didn't know that, then he wouldn't have said that." Elmasry Dep. at 105.

ended when the victim quit or was fired, then cases of egregious harassment could go unpunished, sending the wrong message to the harasser and other employees. Even if M & E's obligation to end Veith's harassment of Elmasry terminated when Elmasry quit her job, its obligation to investigate and address Veith's behavior did not. Obviously, the employer's remedial obligation cannot be triggered until the employer is aware that harassment may have occurred. The record here indicates that M & E was on notice of Elmasry's complaints before she brought this lawsuit. Therefore, Elmasry has raised a further question of fact that defeats summary judgment on this element of M & E's <u>Burlington</u> defense.

Because the court finds that M & E is not entitled to summary judgment on the first element of the <u>Burlington</u> defense, the court need not consider whether Elmasry has raised a genuine issue of material fact with respect to the second element.


3. <u>Hostile Work Environment</u>

M & E argues that it is entitled to summary judgment because the facts do not support a finding that Elmasry was subjected to a hostile work environment while employed at M & E.

Hostile work environment "requires a showing of severe or pervasive conduct," such that it constitutes a change in the terms and conditions of employment. <u>Burlington</u>, 524 U.S. at 754;

22

see also <u>Meritor</u>, 477 U.S. at 67. The work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." <u>Faragher</u>, 524 U.S. at 775 (citing <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21-22 (1993)). In deciding whether harassment is actionable under Title VII, the court must consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Id.</u> at 787-88 (quoting <u>Harris</u>, 510 U.S. at 23); <u>see also</u> <u>Brown v. Hot, Sexy and Safer Prods., Inc.</u>, 68 F.3d 525, 540 (1st Cir. 1995) (applying Title VII analysis to Title IX case).

Elmasry has submitted evidence indicating that Veith very frequently commented to her about her appearance, sometimes in an overtly sexual manner, such as inquiring about her bra size. On more than one occasion he asked for a kiss or a hug, and made comments that could be interpreted as indications that he wanted to have a sexual relationship with Elmasry. The record supports an inference that Veith gave her money inappropriately, that she felt obligated to take the money because of his position, and that she believed that by making her indebted to him, he was

23

increasing his own expectations of a sexual reward. Elmasry claims she felt uncomfortable because of the obvious favoritism Veith showed her in the office, including the fact that he paid her for time she did not work, gave her a position for which she was less than qualified, and often took her out for meals. Elmasry states that Veith initiated contact with her outside the workplace, and that on one occasion he asked her to dress up and come to a restaurant where he and other men from the company were waiting and where he touched her. She also testified in a deposition that Veith asked her to dress up when his supervisor came to the office and warned her that the supervisor might want to "take her away" from Veith once he saw her breasts.

Considering the Brown factors in the light most favorable to Elmasry, the record supports an inference that the conduct about which Elmasry complains occurred very frequently for the duration of time she was employed at M & E. She missed work because of Veith's behavior and felt humiliated at work because of how Veith acted towards her and how he represented their relationship to others. The court cannot conclude that no trier of fact would find that Veith's behavior was objectively and subjectively offensive.

The court finds that Elmasry has raised a genuine issue of material fact as to whether she was subjected to a hostile work

24

environment, precluding summary judgment for M & E on the claim of sexual harassment.


B.    Negligent Infliction of Emotional Distress

In addition to her claim of sexual harassment, Elmasry brings claims of negligent and intentional infliction of emotional distress against Veith.  Veith argues that because Elmasry's pleadings primarily allege that he acted intentionally, she cannot also claim that he acted negligently.  Veith rests this argument on Liu v. Striuli, 36 F. Supp. 2d 452 (D.R.I. 1999).

Liu was an extreme case involving allegations of repeated rapes of a student by a professor.  See Liu, 36 F. Supp. 2d at 458-62.  The student claimed that the professor threatened her with deportation and inflicted severe physical abuse as part of a calculated scheme.  See id. at 480.  Because the nature of the behavior, according to the student's version of the facts as set forth in her complaint, was so plainly intentional, the court held that the plaintiff could not make a claim of negligent infliction of emotional distress.  See id.  In contrast, in this case the evidence viewed in the light most favorable to Elmasry could support a finding of negligent infliction of emotional distress.  Therefore, Liu is not persuasive.

Veith also claims that New Hampshire law only recognizes the claim of negligent infliction of emotional distress in cases where a bystander witnesses injury to a close family member. However, New Hampshire law permits a plaintiff to recover damages for emotional distress under a theory of negligence if she suffered physical symptoms as a result of the emotional distress. See Thorpe v. State of New Hampshire, Dep't of Corrections, 133 N.H. 299, 303 (1990).  For these reasons, Veith is not entitled to summary judgment on the claim of negligent infliction of emotional distress.

C.    Intentional Infliction of Emotional Distress

To support her claim of intentional infliction of emotional distress, Elmasry must show that Veith intentionally or recklessly caused her severe emotional distress through his extreme and outrageous conduct.  See Miller v. CBC Cos., 908 F. Supp. 1054, 1067 (D.N.H. 1995) (citing Morancy v. Morancy, 134 N.H. 493, 495-96 (1991)).  Veith claims that no reasonable trier of fact could find that his conduct was sufficiently extreme or outrageous.

New Hampshire law follows the definition of outrageous conduct found in the Restatement (Second) of Torts.  See Godfrey v. Perkin-Elmer Corp., 794 F. Supp. 1179, 1188 (D.N.H. 1992).

26

According to the Restatement, the offending conduct should be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. at 1189 (quoting Restatement (Second) of Torts § 46, cmt. d (1965)).

Whether conduct is extreme or outrageous depends partly on the context in which it occurs. See Godfrey, 794 F. Supp. at 1189. While insults or epithets may not always rise to the level described in the Restatement, sexual banter between individuals who do not work together is very different from sexual comments a supervisor makes to an employee. See id. This court has previously declined to grant summary judgment in cases involving improper sexual advances and comments made on the job. See id.; Chamberlin v. 101 Realty, Inc., 626 F. Supp. 865, 869 (D.N.H. 1985) (facts related in Chamberlin, 915 F.2d 777, 780 (1st Cir. 1990)). Elmasry has raised a genuine issue of fact that Veith's conduct towards her went "beyond the mere indignities, annoyances, or petty oppressions that one may expect to encounter in one's daily life." See Godfrey, 794 F. Supp. at 1189. Therefore, Veith is not entitled to summary judgment on this claim.

27

<u>Conclusion</u>

For the foregoing reasons, the defendants' motion for summary judgment (document no. 18) is denied as to the claim of sexual harassment against defendant M & E Manufacturing Company and the claims of intentional and negligent infliction of emotional distress against defendant Veith.  The motion is granted as to the claim of sexual harassment under Title VII against defendant Veith and the claims of intentional and negligent infliction of emotional distress against defendant M & E Manufacturing Company.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

January 7, 2000

cc:  Edgar D. McKean III, Esquire
     Edward M. Kaplan, Esquire

28